## D. L. SERVIS *v.* BEATTY and KILLINGSWORTH.

1. CHANCERY: EVIDENCE: WHAT PARTIES MAY BE WITNESSES, AND WHEN.—A defendant may be examined as a witness by the complainant, and where he has no interest in the matter upon which it is proposed to examine him, he may be examined for his co-defendant; but in no case can a complainant be examined as a witness, either for a co-complainant or a defendant; and this rule applies also to a complainant in a cross-bill, who is proposed to be examined in reference to the facts therein alleged, and concerning which a discovery was sought.

2. VENDOR AND VENDEE: VENDOR'S LIEN.—The equitable lien of the vendor of land is not founded upon matter of record, nor upon express contract, but is merely implied from the presumed intention of the parties; and whether it be treated as a trust or a natural equity, its very nature implies the existence of a title, either legal or equitable, in the vendee, on which it may attach; and hence, where the vendor executes only a bond, to make title upon the payment of the purchase-money, retaining the title in himself as security for the purchase-money, no lien exists.

3. SAME.—Notwithstanding no lien is reserved to the vendor, when he makes a bond to convey title upon payment of the purchase-money, yet if he die, and by fraud or collusion between the vendee and his administrator, the latter executes a deed under the order of the Probate Court, when the purchase-money has not been paid, the deed not being absolutely void, but only voidable at the election of the parties interested, vests a title *de facto* in the vendee, upon which the vendor's lien will attach.

4. CONSTITUTION: JURISDICTION OF COURTS VESTED BY: RULE ON THAT SUBJECT.—The judicial power of the State is vested by the Constitution in the several courts therein provided for, and their jurisdiction is prescribed in very general terms; but what particular subjects are embraced in the general grant of jurisdiction to the several courts, are not defined by the Constitution; and hence, as a matter of necessity, in order to ascertain the boundaries of the jurisdiction of the courts, reference must be had to the systems of jurisprudence prevalent at the time the Constitution was adopted, and to the legislation of the State, with a view to which the framers of the Constitution must be understood to have acted; and although the jurisdiction of the several courts are separate and distinct, and in a certain sense exclusive, yet where, by the tests before referred to, the jurisdiction of two or more of the courts is concurrent as to a particular subject, it necessarily remains so in all cases where the Constitution has not expressly otherwise provided; since there is no rule by which this concurrent jurisdiction can be assigned to one and excluded from another; therefore, it does not follow, because the Chancery Court has jurisdiction to enforce the specific performance of contracts in relation to land, that the Probate Court has not the same authority in a case provided for by the legislature of the State when the Constitution was adopted.

Servis *v.* Beatty et al.

5. PROBATE COURT: JURISDICTION.—The Probate Court is vested by the Constitution with jurisdiction over matters testamentary and of administration ; but the Constitution does not prescribe any rule by which to determine what are matters testamentary and matters of administration; and as it is competent for the legislature to prescribe the duties of executors and administrators, these terms may be more or less extensive, according to the prevailing system. Where, therefore, the legislature imposes a duty on the administrator or executor, in reference to the estate, real or personal, of his decedent, it must be considered as matter of administration, and within the jurisdiction of the Probate Court; and hence, the Act of 1821, Hutch. Dig. 671, § 114, which provides that the Probate Court shall direct the executor or administrator, upon proof of payment of the purchase-money, to convey lands, which his decedent had sold by a title bond, is constitutional, and a decree so rendered valid.

6. CHANCERY: PLEADING: BONA FIDE PURCHASER.—The same strictness in setting up the defence of a *bona fide* purchase for a valuable consideration without notice, is not required when made in an answer as in a plea. The answer need not aver that the whole of the purchase-money was paid before notice of the defect in the title.

7. CHANCERY: PROTECTION OF PURCHASER MAKING PARTIAL PAYMENT BEFORE NOTICE. —The rule that payment of a part of the purchase-money before notice, although not sufficient to invest the vendee with the character of a *bona fide* purchaser, as it regards the estate purchased, yet gives him the right to require reimbursement from the owner, as the condition of giving way to his title, seems to accord with the principles of justice and reason, and should, therefore, be recognized by the courts of this State.

8. SAME: WHERE THE PARAMOUNT CLAIM IS A MERE LIEN.—Where the partial payment, made by a purchaser before notice of any defect in the title, is equal to the value of the estate purchased, at the time of the final decree, a bill to enforce a mere lien on the land will be dismissed.

APPEAL from the Superior Court of Chancery. Hon. Charles Scott, chancellor.

This was a bill, filed in the Superior Court of Chancery, to enforce the vendor's lien for the unpaid purchase-money on certain land sold by the complainant's intestate to Beatty, one of the defendants, and by him afterwards sold to Killingsworth, the other defendant.

The bill in substance charged, that on the 3d day of January, 1837, one Josiah Stone bargained and sold to defendant, William Beatty, certain lands, for about the sum of $13,800, to secure the payment of which, Beatty executed his promissory notes, falling due respectively on the first days of January, 1838, 1839 and 1840; and that Stone executed his title bond, by which he bound

himself to make title when the purchase-money was paid; that in a few months afterwards Stone died, without ever having made a deed or received the purchase-money, and that one R. G. Davis was appointed administrator on his estate.

That Davis and Beatty entered into an agreement, by which Davis was to take the land and pay the purchase-money; and to that end Davis and Beatty entered into a fraudulent and collusive arrangement, by which the latter filed a petition in the Probate Court, against Davis, as administrator, to procure a deed for the land. That Davis appeared in open court and waived citation, and confessed the allegation of the petition that the purchase-money had been paid, and that, thereupon, the court ordered him to execute a deed to Beatty, conveying the legal title to the land, which he accordingly did; that the purchase-money was not then paid, nor has it ever been paid, or any part of it, except about the sum of $1,800; but that the same is now due.

That Beatty and Davis failed to consummate their agreement that the latter should take the land, and that Beatty soon afterwards, in the autumn or winter of 1837, sold the land to Killingsworth for $14,000, on a credit of one and two years; and in May, 1838, executed a deed to him therefor; and that Killingsworth purchased with a full knowledge of the fraud committed by Davis and Beatty in procuring a deed to the land. The bill further charged, that Davis's letters were afterwards revoked and that he was insolvent; and that one Simpson was appointed administrator *de bonis non*, and that whilst he acted as such he received a deed for the land from one Francis Stone, who was Josiah Stone's vendor, and who had executed a title bond only during the life of Josiah Stone; that afterwards Simpson had been discharged from the administration, and that complainant was appointed administrator *de bonis non*.

Beatty answered, acknowledging the allegations of the bill in reference to the mode in which the title to the land had been procured, and that the purchase-money was still unpaid.

Killingsworth answered, and claimed the protection of being a *bona fide* purchaser for a valuable consideration, without notice. The answer in substance stated that, in November, 1837, he

applied to Beatty to purchase the land, and offered to pay $14,000 for it, provided a good title could be made ; that Beatty informed him that he only had a title bond, and respondent then refused to purchase. That Beatty afterwards, during the Christmas holidays, in 1837, came to respondent and informed him that he had procured a deed. Respondent thereupon submitted the deed to able counsel, and was informed that Beatty had a good title; thereupon respondent purchased the land for $14,000, one-half of which was payable 1st January, 1839, and the remainder 1st January, 1840. That soon afterwards Beatty discounted respondent's two notes, one at the Bank of Port Gibson, and the other at the Commercial Bank of Rodney, and that the respondent had paid $3,000 on one of the notes, before he had any notice of any defect in the title. That he was informed of the facts charged in the bill in relation to the collusive arrangement between Davis and Beatty, by the administrator *de bonis non* of said Josiah Stone, and therefore he determined not to make any more payments. He was then sued by both of the banks who held his notes, and one of them recovered judgment, and respondent believing that the other would succeed, he compromised with them by paying $1,800 cash, and renewing his note. He denied unequivocally that he had any notice, as charged in the bill, and stated that he bought under the firm conviction that he was getting a good title, and without the slightest intimation or suspicion as to the fraudulent character of Beatty's deed; that if he had had such notice he would not have purchased, as he gave a very high price for the land, and more than it could have been sold for to any other person.

The proof established the allegations of the bill, except on the point of notice to Killingsworth. On this point the depositions of Beatty and * * * * were taken by the complainant. Beatty in substance stated, that about the time of the purchase he had several conversations with Killingsworth in relation to the title, and he believed that all the facts were communicated to him, but he cannot say positively. The other witness testified that he had on several occasions, before Killingsworth's purchase, communicated to him fully all the circumstances connected with the making of the deed by the administrator of Stone, and that the purchase-money was

unpaid.   Seven witnesses swore that this last witness's character was such that they would not believe him on oath, and three witnesses testified that his character was good.   Proof was also made that the land was not worth more than the payments which had been made by Killingsworth.

Afterwards, Beatty and Killingsworth filed an amended answer, which they made a cross-bill against the complainant and Freeland and Murdock, the assignees of the Commercial Bank of Rodney, in which they alleged that a valid compromise of the suit had been made with those parties, by which it was agreed that the bill should be dismissed.   Davis, and Freeland and Murdock answered, denying the equity of the cross-bill, and giving a different version to the transaction therein alluded to.   Upon the issue thus made Beatty was examined for Killingsworth, and Servis (who admitted in his answer to the cross-bill that he had no further interest in the suit, and that he had transferred all his rights therein to Freeland and Murdock,) was examined by Freeland and Murdock.   Beatty was examined under an order of court—his deposition to be subject to all legal exceptions.   Beatty filed with his deposition a release by Killingsworth from all responsibility on account of his covenant of warranty contained in the deed Beatty had made to him, but the execution of this release was not proven except by the statement of Beatty in his deposition.   Lewis's deposition was taken without any order of court.   No objections were made to either of these depositions in the court below.   The depositions of these two witnesses were directly opposed to each other—each fully sustaining the side by which he was called, upon the issue made by the cross-bill and the answers thereto.

Upon final hearing the chancellor dismissed the bill, and the complainant appealed.

This cause was first argued in this court at the October term, 1855, and the decree of the court below affirmed, upon the ground that the allegations of the cross-bill, in reference to a compromise, were sustained by the proof.   A petition for a re-argument was filed and granted, and the cause was again argued at the present term of the court.

*W. S. Wilson,* for appellant.

When this case was before the court on the former argument, I endeavoured on the first branch of the case to maintain three propositions :—

First.   That as Killingsworth knew the source of Beatty's pretended title, he knew, in legal contemplation, that he was buying a mere equity, because the Probate Court of Jefferson had not the constitutional power to grant the order for the conveyance to Beatty to be made by the administrator of Stone's estate.

Secondly.   That Killingsworth's answer contains scarcely a single one of the averments required by the rules of equity of him who claims protection as a *bona fide* purchaser without notice.

Thirdly.   That the proof and the facts in the case show that Killingsworth had notice actual and constructive of the fraudulent conduct of Davis and Beatty.

These I will now attempt to establish with a Fourth—that Killingsworth also knew that he was buying a mere equity, because Josiah Stone himself had not the legal title to the land at his death, and Killingsworth knew the fact.

1. It is insisted that the act of the legislature (Hutch. Dig. 671,) authorising the Probate Court to decree a title to be made by an administrator on the title bond of his intestate, is unconstitutional for two reasons.   1st.   Because the subject-matter—the decreeing a specific performance of a contract,—is by the Constitution confided to the Court of Chancery.   2nd.   Because by the Act the heirs at law are not required to be made parties to the proceeding, and they may thus, against the provision of the bill of rights, be deprived of their property "*without due course of law.*"

As to the 1st.   The Constitution distributes amongst the various courts, which it creates, the subjects of which they shall have cognizance.   It creates a Court of Chancery, " with full jurisdiction in all matters of equity ;" a Court of Probate, " with jurisdiction in matters testamentary and of administration, in orphans' business, and the allotment of dower, in cases of idiocy and lunacy, and of persons *non compos mentis.*"

In *Blanton* v. *King*, 2 How. 586, (affirmed in *Carmichael* v. *Browder*, 3 How. 252,) this court expressly declared that the

jurisdiction confided to each court was exclusive.   Accordingly it was held in those cases, and over and over again since, that the Court of Chancery could not entertain bills to bring executors and administrators to account, although such had been formerly one of the principal heads of its jurisdiction.   This was, because the subject-matter was one of administration, which by necessary implication although not in express terms, was by the constitution confided to the exclusive jurisdiction of the Probate Court.

Now, I ask, if one sells land to another, and covenants to make title upon payment of the purchase-money, and the vendor refuses to fulfil the contract, is it not a " matter of equity," of which a Court of Chancery alone can take cognizance to compel a performance ?   If the vendor dies and the title is cast upon his heir, the vendee having paid or being ready to pay the purchase-money, is it any the less " a matter of equity," respecting which a Court of Chancery can make a like decree ?   Can any one doubt that bills in equity will lie against heirs in the case supposed ?   Such bills have been filed in chancery, and are known to be now pending, without a doubt thus far expressed as to the competency of the court to give relief.   If it can rightfully do so, does not the doctrine of exclusive jurisdiction, so often announced by this court, by inevitable logical necessity, shut out the Probate Court from the exercise of the same power.   If not, then it follows, that while this court puts a curb upon the Court of Chancery, and keeps it strictly confined within its prescribed limits, the Court of Probates is regulated with a partial and indulgent eye, and pardoned whatever trespass or encroachment it may on any side commit.

But can this power claimed for the Probate Court be with any plausibility deduced from the Constitution.   The difficulty of drawing the boundary of any court so as in advance to admit or exclude every possible case that can arise, is perceived and fully admitted.   But it does not follow that the line itself does not exist. Without therefore undertaking to define such a line with nice precision, it would probably be the part of prudence to determine each case as it may arise.

Not assuming then to be able to announce any general rule which could be relied upon, I yet will undertake to say that if

the jurisdiction in this case claimed for the Probate Court can be sustained, it will be for reasons that will lead to consequences the most absurd.

If its jurisdiction was rightfully exercised, it could have been only because the subject-matter was one either "testamentary," or " of administration," or pertaining to "orphans' business" or " the allotment of dower" or relating to the "*non compotes mentis*." It cannot be said to have been a matter testamentary, or to have belonged to either of the last three divisions. If so, then to have been within the province of the Probate Court it must have been a " matter of administration." How a matter of administration? Why clearly no otherwise than that the administrator could alone have given Beatty a good receipt and acquittance for the purchase-money. To have received and acquitted may have been matter of administration. But does. it follow that a matter of administration draws into the Probate Court every incident thereto, and gives to the court jurisdiction of every person or thing with whom or with which it may have to deal? If so we may be led to strange results.

An administrator of a deceased mortgagee alone can give an acquittance for the mortgage debt. Could the Probate Court have jurisdiction *therefore* of a bill to redeem, and to settle the nice and complicated questions that may arise in such suits?

It is the duty of an administrator to collect the debts due to the intestate, and to pay debts so far as he has assets; would it *therefore* be competent for the legislature to oust the Circuit Court of its jurisdiction, and declare that suits by or against administrators for the recovery of debts might be brought in the Probate Courts?

But the jurisdiction of chancery in cases of mortgages, and of the Circuit Courts in cases for the collection of debts by judgment, is no more clearly ascertained than is the jurisdiction of equity to compel the specific performance of contracts. If the latter class of cases can rightfully be transferred to the Probate Court, why not the former. It is not perceived that any good reason can be assigned for a distinction. If not, then it will follow that every imaginable case in which an executor or administrator is a

Servis *v*. Beatty et al.

party may be entertained by the Court of Probates. That court then instead of having, as it has been suffered to have, a simple jurisdiction over executors and administrators as *officers* of its own appointment and accountable to it *as such*, may gradually absorb the powers of the other tribunals.

Not only so, but if this jurisdiction to decree the execution of title deeds properly belongs to it, questions of the greatest difficulty, and the adjustment of the nicest and most conflicting equities may devolve upon it, for which its machinery is altogether inadequate. For upon the same principle on which the jurisdiction in the present case is upheld, may the Probate Court have conferred upon it the power to entertain bills for the performance of every conceivable contract to which a testator or intestate may have been a party.

Suppose the heir-at-law of Stone, in this case could have known that his ancestor's contract had been procured by fraud, could the Probate Court have let him in with a cross-bill, and have decreed that the contract should be cancelled, and that he should refund the purchase-money as a condition of the cancellation, if any had been paid? But,

2. Under this statute, the heir-at-law is not required to be made a party, nor has he any opportunity to set up any defence to the vendee's application. The proceeding is confined to the holder of the title-bond and the administrator. And thus, without a chance of being heard, the title of the heir may be divested, and the most flagrant and irreparable injustice may be done. That this may be, the present case furnishes the strongest and most pointed illustration; for by fraudulent collusion, Beatty, an insolvent man, three years in advance of the time of payment of the purchase-money, procured a deed to be made by an administrator, to whom he had not paid a cent. Stone's heirs (and it is proved that he had heirs) were not parties to the proceeding, and thus were their rights and property sported with by others, in plain violation of the 10th sect. of the Declaration of Rights, that no one can be deprived of life, liberty or property, "*but by due course of law.*"

But it may be said, that great inconvenience and hardship would result, were the Court to pronounce the law in question unconsti-

Servis v. Beatty et al.

tutional; as titles might be disturbed supposed to have been acquired under it. To this I reply,

I. That the argument from inconvenience is no doubt entitled to much weight, where an effort is made to unsettle a long course of practice, or to disturb a train of judicial decisions establishing a principle as a rule of law. Hence have arisen the maxims " *stare decisis*," and that other " *communis error facit jus*." But I ask, has there been any authoritative decision, that the Probate Court has the power in question, that is claimed for it ? None such is offered to us, for it seems to be conceded, that the question is now for the first time raised. There being no judicial precedents in the way, there is only left an erroneous course of practice to which the effect is sought to be ascribed, of overruling a provision of the Constitution. If the statute be thought to be unconstitutional by the Court, the only way of avoiding the difficulty is to say that the public have thought otherwise, and apply the maxim, that " *common error makes law*." But even in England, where judicial legislation has been more common than I hope it is likely to be with us, that is a maxim which wise judges have restricted and applied with the greatest caution.

Lord Kenyon, 3 Term, Rep. 725, quotes the remarks of Mr. Justice Foster with approbation, that " he hoped he should never hear that rule insisted on, to set up a misconception of the law *in destruction of the law*."

And in O'Connell's case before the House of Lords, Lord Denman, Chief Justice, said : " When in the pursuit of truth, we are obliged to investigate the grounds of the law, it is plain, and has often been proved by recent experience, that the mere statement and re-statement of a doctrine,—the mere repetition of the *cantilena* of lawyers—cannot make it law, unless it can be traced to some *competent authority*, if it be irreconcileable to some clear legal principle." Broom, Legal Maxims, 105.

If the English judges are thus wary in applying the maxim, how much more so will those of America be, when the effort is made by a prevalent error of opinion or practice to overthrow a constitutional principle. How worthless would be our Constitutions, if they could be silently undermined in the mode suggested.

2. The effect to be given to this argument from inconvenience is not made to appear, for the court is left to conjecture how many titles have been acquired under the statute in the Probate Court. That court has doubtless been applied to, but it is also certain that relief has in some cases been sought in Chancery against heirs-at-law. If this court shall decide that the Probate Court has rightfully had jurisdiction of such cases, may not doubt and suspicion be cast upon those titles which have been acquired by the intervention of Chancery? The act was passed in 1822, and it is the Revised Constitution of 1833 with which it is supposed to conflict.

3. It is suggested whether greater inconvenience and danger may not result to the community from allowing the Probate Court to go on in the exercise of the jurisdiction claimed for it, than by at once declaring the law of 1822 to be void? Its machinery and organization are believed to be altogether inadequate to the proper exercise of such a jurisdiction; and the outrage and hardship of the case now brought to the notice of the Court, may well be taken as a fair sample of what may be expected from perseverance in practice under the law of 1822.

If the view presented be correct, then it follows that Killingsworth bought a mere equitable title, and that he took it with all its imperfections on its head. 7 Cranch, 34, 48; 7 Peters, 252; 10 Ib. 177; 12 Serg. & Rawle, 389; opinion of Chief Justice Smith in this case.

II. But again, it is alleged in the bill, that Josiah Stone himself had not the legal title; that he held only a bond for title from Francis Stone. William Nelson testifies, that he told Killingsworth of this fact in the fall of 1837, and Killingsworth in his answer states, that he subsequently learned the same fact from Green T. Martin. He must have known, therefore, that he was buying a mere equitable title, and the result follows as above stated.

III. But Killingsworth, by the showing of his answer, was not a *bona fide* purchaser without notice, as this phrase is interpreted in equity. His answer contains scarcely one of the averments which are requisite to make such a defence available. As the effect of

such a defence is to throw the whole burden of proof upon a complainant, the law has surrounded it with safeguards, to prevent its being made the instrument of fraud and injustice. Certain averments are absolutely necessary to be made. They are set forth with minuteness in the notes to *Basset* v. *Nosworthy*, 2 Lead. Cases in Eq., part 1, pp. 45, 59, 60, 61, 83, English ed., notes 44 and 45. To that case the court is referred, as containing a full exposition of the law on this subject, with a collection of the most important authorities.

Without noticing minor points, the following are well settled to be necessary averments of such a defence:—

1. A real or pretended title in the vendor, and that he *was in possession*.

2. A valuable consideration, actually paid before notice, and not merely secured to be paid.

3. There must not only be a denial of actual knowledge of the title or incumbrance relied on by the plaintiffs, but all notice of its existence, which includes constructive as well as actual notice.

4. Notice must be denied at the *time of the execution of the deed*, and also of payment of the money.

A scrutiny of the answer of Killingsworth is invited, with a perfect confidence that it will be found to be defective in these essentials.

First. He does not allege that Beatty was in possession.

Second. He admits that he gave securities only for the purchase-money; not pretending that it was paid.

Third. And we call especial attention to the fact,—he admits in the clearest manner that *he did have notice* of the lien sought to be enforced. Beatty told him of it when they first spoke of the purchase, and informed him of his title bond. He knew how the title was professed to have been acquired—through the order of the Probate Court. His defence therefore is, "I knew of the lien, but thought it had been extinguished." He does not profess to have made inquiries of any body but Beatty, or to have been deceived by those concerned to enforce the lien. Can it be that a man who bought land with full notice of a lien upon it, can set up the defence that he was a *bona fide* purchaser, without notice. That very lien of which

he had notice is sought to be enforced.    He says, I thought it was extinguished.    The answer is, You were mistaken in the fact.

Again, his denial of knowledge of the fraud of Davis and Beatty was insufficient.    He says he had not knowledge of it.    His denial of *notice*, and of any circumstance from which it could have been inferred, should have been broad and explicit, so as to have excluded constructive as well as actual notice.    1 Johns. Ch. Rep. 575; 2 Lead. Cases, Eq., 1st Part, 83, and cases cited.

Fourth.    He does not deny that he had notice *when his deed was executed* in May, 1838, or when *he paid the* $3000, *which he says he paid the Rodney Bank.*    Such denials, explicitly made, are absolutely essential to protect him.    See the book referred to —Lead. Cases, Eq.

He has not proved that he made any payment at all, as is required.    2 Lead. Cases in Eq., 1st Part, 88; 10 Peters, 177.

Beatty only says, in his deposition, that he thinks Killingsworth paid $1500, or $2000 to the Rodney Bank.

Suppose though, Killingsworth had averred that he made a payment to the Rodney Bank, without notice, and had proved a payment, still such partial payment will not protect him.    At the most, he would only have a lien on the land to the extent of his partial payment.

By the English and some American authorities, the purchaser, to be entitled to protection, must have paid all the purchase-money. 2 Lead. Cases in Eq. 1st Part, 79, 80; 2 Sugden, Vend. 274; 8 Wheaton, 449, 450.

Other American authorities hold, that the purchaser can require to be reimbursed the part of the purchase-money he has paid innocently; and some say he has a lien on the land for the purpose. See 2 Lead. Cases in Eq. 1st Part, 80.

In any the most favorable view of the case for Killingsworth then that can be taken, all that he has ever had the right to ask was, that he should be protected in the partial payment to the Rodney Bank.    But he has had the land in possession, by his own admission, since 1st of January, 1837, *and the rents and profits will stand against any claim he may have for re-imbursement of*

*any partial payment he may have made.* An account upon that basis is all that he can ask, or expect to have.

IV. Killingsworth had actual notice of the collusive arrangement between Beatty and Davis. That he had, is proved by the depositions of Beatty, William Nelson, and R. G. Davis, to which the court is referred.

V. If he had not actual, he had constructive notice. He knew, as he admits, of the bond for title. That bond constituting as it does, one of the muniments of his title, he must be held to have known all that it contained. No rule can be better settled, or more reasonable than this.

2 Sugden, Vend. 293, says: "Where a purchaser cannot make out a title but by a deed, which leads him to another fact, whether by description of parties, recital, or otherwise, he will be deemed conusant thereof, for it was *crassa negligentia* that he sought not after it." So if he have notice of a deed, he is bound by all its contents.

Again, at page 290, he says : "What is sufficient to put a purchaser *upon inquiry* is good notice; that is, where a man has sufficient information to lead him to a fact, he shall be deemed conusant of it."

Chancellor Kent has affirmed the rule, and acted on it. 4 Johns. Ch. 45; 1 Id. 268.

Killingsworth's purchase was made in December, 1837, and his deed executed in May, 1838. When he looked into the title bond, he saw by its terms that the purchase-money was not to be paid by Beatty until the years 1838, 1839, and 1840. Beatty is proved to have been insolvent. So that the case presented to Killingsworth was that of Beatty an insolvent man, paying the large sum he was to give to Stone for the land, three years in advance of the time at which payment was to be made. Were not the circumstances so suspicious as to put him on inquiry? If he made not the inquiry, if he remained wilfully blind, was he not guilty of that *crassa negligentia* of which Sugden speaks? Is it too much now to ask of him, as a reasonably prudent man, with such facts staring him in the face, that he should have pursued the investigation which they naturally suggested?

VI. Lastly. By a cross-bill filed in 1852, the appellees insisted that by an agreement and compromise effected in 1848, between Beatty and Servis, the latter agreed that the suit in chancery should be dismissed. The cross-bill is filed as well against Servis as against Thomas Freeland and John Murdock, by whom it is alleged that $3000 were advanced for Beatty to Servis, who, for that sum, was to release Beatty from the debt to Stone's estate.

The cross-bill is sworn to by Beatty, and he has also given a deposition proving its averments. Servis, and Freeland and Murdock, have all answered, denying that the $3000 were advanced for Beatty, or that the suit was to be dismissed. Servis has given a deposition to the same effect. When the case was first before the court, the deposition of Servis was not noticed because of a misapprehension which, it is believed, has now been removed.

With regard to this deposition, I will state, that after the cause had been decided by the chancellor, one of the counsel of the appellees, remarked to me, that he had not previously heard of it, and was surprised by it. I at once told him, if that were so, we would, on behalf of complainant, agree that the decree should be set aside, and the cause remanded; that we intended to take the case to the Court of Errors, and the deposition would necessarily go up with the record. The proposition was however declined.

We respectfully insist, for the reasons given in the petition for re-argument filed, this deposition cannot be disregarded. No order of court for taking it, is contained in the record, it is true; but this was mere irregularity in practice, which, in this court, must be taken to have been waived by the opposite party. 3 Greenleaf, Evidence, 323.

The rule on the subject is clearly laid down in the opinion of the Chief Justice, delivered in the case, when speaking of the deposition of Beatty. But the same objection exists to the deposition of Beatty. No order was obtained to take his deposition in the cross-cause. There was an order to take his deposition, made 11th June, 1852, and the cross-bill was not filed until December of that year.

In addition, Beatty as a *complainant* in the cross-bill, was not competent as a witness, while Servis, as a *defendant*, was compe-

tent.    Gresley, Eq. Evid. 243; 2 Danl. Chan. Prac. 1036, 1037.
Reference is made ·to the petition for re-argument, where this
matter is discussed.

We also respectfully ask the court, for the reasons given in the
·petition referred to, to re-consider the opinion heretofore given
that Beatty's deposition, under the statute, Hutch. Dig. 771,
turned the scale in favor of the appellees.

The case, as. presented to the court, was that of two complain-
ants, one swearing positively from actual knowledge, and the
other from information derived from him, to the truth of certain
facts alleged, opposed by *three* defendants, called upon for dis-
covery, who flatly deny the truth of the statements made.. In the
view that was taken of the case (Servis's deposition being thrown
aside) the deposition of Beatty was held to give the appellees the
preponderance of proof.   But, is it not worthy of consideration,
that Beatty was not a new witness, introduced to turn a scale
balanced by oath against oath, but was the very complainant
whose affidavit to the cross-bill had already had the effect of putting
the scale in equipoise.  If he was credible, as he was under the
statute, so as by his oath to the cross-bill to. put the case in even
balance against the sworn answers of defendants, how could he,
the *same man*, swearing to the *same facts* as a witness, have been
any more credible, or have added any more weight than he had
already given?   When his deposition was taken, he had no more
than was already in the case, viz: his oath · to the same facts
detailed in the cross-bill which he had sworn to.   But suppose we
are mistaken in this, and that the same effect is to be ascribed to
Beatty's deposition as would have been given to that of any other
person who might have been produced, how will the case then
stand?

The old rule was, that the answer of a defendant, explicit in its
denials, should prevail unless overcome by two witnesses, or one
witness with corroborating circumstances; the reason being that
the defendant is made a witness—and as such, equal to any other—
by being called upon for discovery.   2 Story, Equity, 1528; 2
Vesey, Jr., (Sumner's edit.) 243, note.   Lord Loughborough, in
this last case, thus expresses himself: "The rule of the court is, if

it were the case of a *single* defendant, the plaintiff cannot have a decree where the fact upon which it is to be founded is represented one way by the defendant, another way by a *single* witness."

In this case, Beatty stood alone a *single* witness, while there were *three* defendants, Servis, Freeland and Murdock, denying the truth of his statements.

Now our statute, Hutch. Dig. 771, where the bill is sworn to, merely abolishes this old imperative rule, which required more than one witness to outweigh an answer; and further it provides, " hereafter such an answer . . . shall receive only such weight and credit, upon the final hearing, as in view of the *interest* of the party making the same, and the other circumstances of the case, it may be fairly entitled to." It is submitted that by the terms of ·this statute the oath of the defendant is not to be disregarded. Its plain meaning would seem to be, that the oaths, both of plaintiff and defendant, are to be respected, and the court, instead of being governed absolutely by the answer, as under the old inflexible rule, is at liberty to weigh it, having due regard to the *interest* of the party which may have prompted him to swerve from the truth.

Tested then by the statute, the three defendants to the cross-bill, called upon for discovery, must be deemed to occupy the same position as would be held by any other disinterested witnesses; for it is abundantly apparent that neither of them had any *personal interest* in the suit: Servis having been only an administrator, and Freeland and Murdock trustees for creditors of the Rodney Bank.

*William Sillers* on same side,
Filed an elaborate brief.

*H. T. Ellett*, for appellee.
The abstracts show fully the nature of this case.

It certainly appears that although Beatty, in his petition to the Probate Court averred, and Davis, the administrator, admitted, that the notes given by Beatty on the purchase of the land from Stone were fully paid, yet in fact they were not paid, and the order of the court for Davis to make a deed to Beatty under the

statute, (Hutch. Code, 671,) was procured upon a showing that was untrue in point of fact.

But Killingsworth, who bought the land from Beatty for a full price, cannot be affected by this fraud, unless at the time of his purchase he had notice of it; and the first inquiry, on the merits of this case is, whether he had such notice.

He denies it in the most positive manner in his answer, and this denial must be overcome by proof. The bill not being sworn to, the fact of notice must be proved in the face of the denial of the answer, by the oath of two witnesses, or of one witness, corroborated by circumstances.

It seems, from the testimony, that when Killingsworth first turned his attention to the land, he was informed that Beatty only had a title bond, and that his notes were unpaid. Beatty had proposed to sell it to him on the terms that Killingsworth should take up the notes to Stone, which Killingsworth refused to do. The testimony of William Nelson and G. P. Farley only go to show this knowledge by Killingsworth at the commencement of his talking about the land. Beatty, too, shows this amount of knowledge. But all this testimony is irrelevant to the issue, and proves nothing important to the case. Killingsworth refused to buy under those circumstances, while the land was bound for the payment of Beatty's notes, and refused even to assume those notes himself.

Beatty then set about procuring a title; not, however, with any view to a subsequent sale to Killingsworth, but upon an agreement with Davis, that the latter would take the land and assume the payment of the notes. The Probate Court proceedings were instituted and perfected without any privity with Killingsworth, or any knowledge on his part of what was going on. Beatty obtained the decree of the court, and got a deed from Davis, which *prima facie* invested him with a full legal unencumbered title. It was a perfect title as to any purchaser from him for value, and not having notice of the fraudulent character of the proceedings.

Beatty's negotiation with Davis failed at this point, and in January, 1838, he sold the land to Killingsworth, who first took the advice of able counsel as to the regularity of the title.

The question now is, whether Killingsworth, *when he made this*

*purchase,* knew that Beatty had fraudulently procured the title to be made, without having first made satisfaction of his notes? He was not to expect or presume that Beatty and Davis had committed a fraud. Davis was under the solemn sanction of his oath, to take care of the interests of the estate of Stone. The decree of the court, which could only be granted upon a satisfactory showing that the notes had been liquidated, was the very strongest assurance to him of the fairness and legality of the transaction.

But it is said he had *actual notice,* and Beatty and Davis are relied on to establish the fact.

Beatty, in his deposition, expresses a very strong belief that Killingsworth knew all about it. He cannot say so positively, but from the notoriety of the transaction, and from having talked so much about it with Killingsworth and others, he feels very sure that Killingsworth knew all the facts. He states no fact showing such knowledge, but only a strong belief on the subject. Now, this is no testimony at all; the belief of the witness is nothing: he must give *facts,* and the *court* forms the *belief.* What *facts* does he give? Only that the transaction was notorious—that he spoke about it frequently, and had a good many conversations with Killingsworth on the subject. *What* was notorious? What did he talk to Killingsworth and others about? He does not say it was the circumstances and means by which he obtained the title. That he would not be likely to talk much about. It must have been the fact that he had obtained the title. And Beatty, knowing that Killingsworth was aware how the matter had previously stood, seems to conclude from that that he must have known that he procured the title without arranging the notes. One fact, however, completely demolishes the whole of this fabric of presumptions; Beatty had offered him the land a few months before, on condition that he would assume the debt to Stone—asking *no more*—and Killingsworth refused to take it on those terms; yet, now it is pretended that he agreed to pay Beatty $14,000 for the land, and to take it subject to the lien of the notes to Stone, knowing at the time that Beatty was insolvent. Such a supposition is absurd and preposterous.

It must be borne in mind, too, that this witness, in swearing to

his belief that Killingsworth had this notice, is swearing to exone-
rate himself from the imputation of having committed a fraud
upon Killingsworth, as well as upon Stone's estate.

The only other witness relied on to establish this notice is Davis,
the administrator; he swears to it, and corroborates it by circum-
stances, and if he is to be believed, he is certainly *one* of the re-
quired *witnesses*.

He testifies under the strongest possible inducements to commit
perjury.

We insist that he is an incompetent witness on account of inte-
rest. If the lien on this land is destroyed it is by his fraudulent
conduct in confessing the payment of the debt, and consenting to
a decree for a conveyance. Beatty's insolvency is shown. This
land is the only security for the debt; if this security fails the
debt is lost, and it being lost by Davis's misconduct as administra-
tor, he will clearly be liable to the heirs of Stone for all the dam-
age suffered. It is not pretended that he is insolvent; but that
would make no difference, for it is the *liability* that creates the
interest. There is no equipoise of this liability, and it is a clear
case of a distinct and certain legal interest. He is therefore in-
competent, and his testimony must be ruled out.

But if he were competent, he is unworthy of credit. He con-
fesses to a gross fraud on the estate that was confided to his trust,
and he swears to relieve himself and the estate, and to involve a
third party, to whom he is not responsible, in the consequences of
his fraud.

Then he swears to such corroborating circumstances, and tells of so
many, and such long and earnest conversations with Killingsworth,
all directed to this one point of notifying him of this fact, so import-
ant in this case, that his testimony is improbable and suspicious.
If, as the books say, "over caution is one of the settled *indicia* of
fraud," so sure is too much anxiety and too much knowledge an
evidence that testimony is false.

The kind of testimony he gives is of a most suspicious and unre-
liable character, consisting of pretended conversations with Kil-
lingsworth, when no one could hear them. Such evidence has been
generally received with great disfavor, as of a dangerous nature.

"Receivable with great caution;" Hardin, Rep. 549. "With suspicion;" 1 Tenn. Rep. 463. "Dangerous, unless confirmed by circumstances." Sutherland, J. 1 Wend. 625, 648, 649, 653, 654. "The most dangerous of all evidence;" 5 Martin, N. S. 14; (3 Cond. Rep. (La.) 444.) "The weakest of all evidence deemed admissible in law;" 2 J. J. Marsh. 65. "Of all evidence, to be weighed with the greatest caution;" 4 Monroe, 236, 240, 241. "The weakest and most unsatisfactory of all testimony, on account of the *facility with which it is fabricated*, and the difficulty of disproving it, if false;" 6 Monroe, 136. "Subject to much imperfection and mistake;" 1 Greenl. Ev. § 200. "The weakest and most suspicious of all testimony; ever liable to be obtained by artifice, seldom remembered accurately, or reported with due precision; and incapable of being disproved by negative testimony;" 4 Black. Com. 357.

If this be the value of such testimony in its best condition, and coming through an unpolluted channel, what is it worth when given by such a witness as Davis?

To discredit a witness, is one of the most difficult undertakings in the life of a lawyer, so seldom is it that a man becomes so bad that his neighbors are willing to swear that they would not believe him on oath. The difficulty is always increased in the case of a man like Davis—possessed of some substance, and respectably connected.

Yet the effort here—indeed it cost no effort—is entirely successful. Seven of his neighbors, intelligent and honorable men, of standing and character, who know him well, all swear that, from their knowledge of his character, they would not believe him on his oath: only three can be found to express a contrary opinion; one of them is Davis's father-in-law—and all three of them say they never heard his character for veracity spoken of, one way or the other.

There is then *no witness* who disproves the answer on this point, of notice, and the bill must be dismissed.

But if Beatty's belief were accepted as proof, and if he be accounted one witness, where are the *corroborating circumstances?* There are none. On the contrary, all the circumstances corrobo-

rate the answer. The price paid, or agreed to be paid to Beatty, was a full price for the land, and it is altogether inadmissible to suppose that Killingsworth gave that price for the land, knowing it to be bound for Beatty's notes to Stone.

But if complainants' case were fully made out in the particulars we have been discussing, the matters set up by the cross-bill afford a complete defence to the whole case.

This cross-bill being sworn to, it requires but *one witness*, without corroborating circumstances, to sustain it.

The interest of Beatty, the witness, after the release given him by Killingsworth, is all in favor of the complainants in the original bill. His credibility is not disputed or questioned.

He is fully corroborated, to a considerable extent, by the answers, and to the whole extent, by all the circumstances surrounding the transaction.

He could have no motive whatever to part with the means he had control of, and to put himself to so much pains and trouble, except for the purpose of perfecting Killingsworth's title, by obtaining a release of this incumbrance, and thus relieving himself from his warranty to Killingsworth.

The suggestion that he did it to get released as indorser of the notes of Killingsworth and Jefferies, is simply absurd, for he is insolvent, and the makers of the notes are rich.

It is needless to recite his testimony here; it must be *read*, and one reading is sufficient. It shows an agreement to dismiss this suit and discharge this claim upon the land for a price agreed upon, *which price he has paid.* It is an accord and satisfaction, made pending the suit, and set up by a cross-bill, in the nature of a plea *puis darrein continuance.*

This testimony cannot be ruled out as incompetent, nor rejected as false; it fills the measure required by the rule of equity, as modified by our statute (Hutch. Code, 771, § 6), and it must prevail.

The complainant could not have a decree, if his case was ever so plain. He shows that a note of $500 given to Francis Stone, and equally secured with the other notes by the title bond and lien

reserved, is still outstanding.    The holder of this note is not made a party, and without this there can be no decree.

*J. B. Coleman,* on same side,

Submitted the following brief on the re-argument of the case, in support of the constitutionality of the act of the Legislature, authorizing the Probate Court to order an administrator to make a deed in pursuance of the title bond of his intestate.

An argument has been granted in this case, upon the petition of the appellants, and the attention of counsel has been directed by the court, to the question of the jurisdiction of the Probate Court to decree a conveyance.

The argument of the counsel of the appellants is, that the act (Hutch. Code, 671, § 114,) giving this jurisdiction to the Probate Court, is unconstitutional; that a Court of Chancery alone possesses this power.

The Constitution has conferred upon the Probate Court, jurisdiction "in all matters testamentary and of administration;" and this court has decided, "that this is not a limited jurisdiction, but is general in all the subjects mentioned." *Carmichael* v. *Browder,* 3 How. 255.

We submit that the jurisdiction of the Probate Court, to compel the administrator to make title, where his intestate has given a title bond, and has died without executing a deed, is jurisdiction *in a matter of administration.*

When the owner of land has executed a title bond, and the obligee in the bond has complied with the conditions, by the payment of the money, the beneficial title to the land is to all intents and purposes vested in the obligee.    Nothing but the mere naked legal title remains in the obligor, without any beneficial interest whatever.

Speaking of the liability of land to which the vendor has made a bond for title, to be levied upon under execution against the vendor, this court says: "If any portion of the purchase-money be paid before the judgment, the land can no longer be the subject of execution sale, as the property of the vendor." *Money* v. *Dorsey,* 7 S. & M. 22.

" Where a bond for title is given, the interest of the vendee is not the subject of execution sale at law, unless the purchase-money has all been paid." *Harmon* v. *James*, 7 S. & M. 111. Thus showing, that when the purchase-money has all been paid, the interest of the vendee is subject to sale under execution at law.

The effect then, of the execution of a title bond, and the payment of the money by the obliger, is a total divestiture of all the interest of the obligor in the land.

By the execution of a title bond, the obligor elects to turn his real estate into money—to change his realty into personalty—and upon the payment of the purchase-money, the change is effected *eo instanti*.

The obligor has thus, by his own voluntary act, turned his real estate into personalty : or, if the purchase-money has not been paid to him in his lifetime, he has bound himself and his representatives, that upon the payment of the purchase-money, this change from realty to personalty shall be consummated.

The obligor dies before the payment of the purchase-money. Now, who is entitled to demand and receive it ? Surely the administrator, and the administrator alone. The heirs could not sue for it, and they could not give a valid acquittance for it, although it was due for land; and for the reason, that the intestate had chosen to divest himself and his heirs of all interest in the land, and to convert it into personalty ; thus making it a matter of administration, subject exclusively to the control of his administrator, and, with which his heirs could have nothing to do.

After the payment of the purchase-money to the administrator, could the heirs set up any title, either at law or in equity, to the land ?

Would not the receipt of the administrator, or proof of the payment of the purchase-money to him, vest a title in the vendee, which could be seized and sold under execution against him? Under the decision in *Harmon* v. *James*, it certainly would.

If then, the payment of the purchase-money to the administrator, would have the same effect as though a conveyance of the legal title bond were made, what reasonable objection can be urged

against the grant of authority to the administrator to do directly, what he has the undoubted power to do by indirection ?

We rely, however, upon the position, that by the act of the intestate in his lifetime, in the execution of a title bond, he has chosen to divest his heirs of all interest in the land, and to convert his real estate into personalty, and thus to make it a matter of administration, over which the Probate Court has full and exclusive jurisdiction.

This view of the case answers another objection urged by the counsel of the appellants, to wit, that under this act, the title of the heirs is divested in a proceeding to which they are not parties. We think we have shown that they had no interest to be divested ; that their interest and title had already been divested by the heir's ancestor in his lifetime.

After a careful examination of all the Reports of this State, we have been unable to find a single case in which the constitutionality of this provision in our probate law has ever been brought in question.  It thus appears, that though it has been upon our statute book since 1822, and has been acted under since that time, its constitutionality and validity have been acquiesced in by the whole Bar of the State.  Titles have been acquired and transferred under it, and were it now to be pronounced unconstitutional, there can be little doubt that great uncertainty, to say the least, would be thrown over the title to a large amount of land in Mississippi.

We do not urge this as an argument to the court to sustain a clearly unconstitutional law; we think it entitled, however, to weight, and to great weight, in a case of doubt ; and that unless the court is satisfied, *beyond a doubt,* that the law is unconstitutional, it would be their duty, under the circumstances, to sustain it.

SMITH, C. J., delivered the opinion of the court.

This was a bill filed in the Superior Court of Chancery by the complainant, David L. Servis, to enforce the vendor's lien for the payment of the purchase-money of land sold by his intestate.

The facts charged in the bill, are substantially as follows :—In

January, 1837, Josiah Stone sold to William Beatty, one of the appellees, a tract of land; Beatty gave his notes, to secure the purchase-money, payable, respectively, on the first of January, 1838, 1839 and 1840, and took from Stone a title bond, conditioned to make a deed in fee simple for the land, upon the full payment of the notes. Stone died within a few months after the sale; and Richard G. Davis, was appointed administrator of his estate.

In the autumn of 1837, in execution of a collusive understanding between Davis and Beatty, the latter filed a petition in the Court of Probates of Jefferson county, in which he alleged that he had fully paid off and satisfied the notes given by him to the intestate, to secure the purchase-money of the land; and praying that Davis, the administrator, might be decreed to convey the land to him in conformity with the terms of the title bond. Davis, voluntarily, appeared in court, waived citation, and confessed the allegations of the petition, whereupon a decree was rendered requiring the administrators to make a deed for the land to Beatty, which was accordingly done. No part of the purchase-money was paid, either at the time when the decree was made or when the deed was executed. In fact, Davis never had possession of either of the notes given by Beatty to secure the price of the land.

Davis's letters were revoked, and the appellant, Servis, was appointed administrator of Stone's estate. After the revocation of Davis's letters, and previous to the grant of administration to Servis, H. W. Simpson, was appointed the administrator, and, as such, on the 7th of November, 1840, received a deed from Francis Stone and wife, for the land, from whom the intestate, previous to the sale to Beatty, had purchased the same.

Within a short time after the deed to Beatty from Davis was executed, Beatty sold the land to the appellee, Killingsworth, and on the 2nd of May, 1838, conveyed it by deed with covenants of general warranty, to him. The sale was made on a credit; and Killingsworth gave to Beatty two notes, each for $7,000, payable respectively on the 1st of January, 1839 and 1840.

Killingsworth, when he accepted the deed from Beatty, had full knowledge of the terms of the sale by the intestate to Beatty; he knew the fraudulent character of the circumstances under

which the deed from Stone's administrator to Beatty was obtained; he knew that the purchase-money was not paid, and that the land was subject to a lien in favor of the intestate's representative.

Beatty was insolvent, and the whole amount due by him as the purchase-money with the exception of about $1,800, remains unpaid. No relief is sought as to Beatty; and no allegation is made that the purchase-money agreed to be paid by Killingsworth was still due and unpaid. The prayer is that the unpaid purchase-money be declared a lien upon the land; and that it be ordered to be sold in satisfaction thereof.

The suit was resisted on two grounds; first, that Killingsworth was a *bona fide* purchaser for a valuable consideration, without notice of the alleged fraud or of the existence of the lien; and second, that the claim set up by the bill was, after the commencement of the suit, compromised and settled, and the bill agreed to be dismisssed.

This latter defence was presented by a cross-bill filed by the appellees, to which Thomas Freeland and John Murdock, with the complainant below, were made parties. Upon the final hearing the bill was dismissed; and an appeal is prosecuted by these parties.

When this cause was submitted on a former occasion, the decree was made to turn, exclusively, upon the question raised by the cross-bill and the answers thereto. And in the determination of that question, the deposition of Servis, taken as a defendant to the cross-bill was disregarded.

We are now satisfied, that, under the circumstances, the objection, for irregularity in taking the deposition, which if made at the proper time and in the mode prescribed, would have prevailed, must be considered as having been waived by the party now objecting. And if the objection be based exclusively on the ground of the incompetency of Servis as a witness, by reason of his position as the original complainant in the bill, it is clear that the same objection applies to the deposition of Beatty, who was one of the complainants in the cross-bill. For though the facts alleged in the cross-bill were designed to be used in aid of a defence set up in the answer to the original bill, a discovery was prayed in

the cross-bill in reference to those very matters. It would be a violation of a plain principle of evidence to allow a party to be examined as a witness to sustain the allegations of his own bill; more especially where a discovery was prayed in reference to the identical facts to which it is proposed to examine him as a witness. A defendant may be examined as a witness by the complainant; and where a defendant is not interested in the matter to which it is proposed to examine him, he may be examined as a witness by a co-defendant; but the rule is explicit that a co-complainant cannot be examined as a witness for the other complainant; nor can he be examined as a witness by the defendant. 1 Smith, Ch. Pr. 342; Gresley, Eq. Ev. 243. The depositions of Servis and Beatty must both be excluded, or received; and in either event the same result would follow. The deposition of Servis, completely neutralizes the evidence of Beatty; and the answers to the cross-bill flatly deny every material allegation contained in it. Under these circumstances it is manifest that the defence set up in the cross-bill, is unsustained by the evidence.

The questions presented by the record are: First, whether the vendor's lien attached to the land in the hands of Beatty, and Second, whether, if in fact a lien was reserved, Killingsworth, the sub-vendee, is entitled to protection as a *bona fide* purchaser, for a valuable consideration, without notice.

But before we proceed to examine these questions, it is necessary that we should understand the true position of the parties, in respect to the title.

As shown by the bill, and contended by the counsel for the appellants, the intestate, Stone, was not possessed of the legal title when he sold the land to Beatty, nor at the time of his death. He had but an equity in the land, holding the bond of his vendor for title, upon payment of the purchase-money. The deed made by Francis Stone, the intestate's vendor, to the administrator of the latter, if it could at all be held to vest the legal title in his heirs, was not executed until a period subsequent to the conveyance from Beatty to Killingsworth. Hence, if the jurisdiction of the Court of Probates, to order the administrator to convey the land to Beatty, and the consequent validity of the deed, made in

execution of the decree, were conceded, the deed of the administrator passed, simply, the equitable interest held by the intestate. Beatty could convey no greater interest, or better title than he, himself, possessed. It is clear, therefore, that Killingsworth would not stand in the attitude of a vendee, holding the legal title to the land, against which the vendor's lien is sought to be enforced. The same, manifestly, would be the result, if it were held that the decree, for want of jurisdiction in the Court of Probates, was utterly void, and the deed made in execution of it, a perfect nullity, which was the ground assumed in the argument for the appellants. Neither Beatty or Killingsworth was ever the owner of the legal title.

On this state of the case, the question is, whether the vendor's lien attached, while the land was in the possession of Beatty.

The lien of a vendor of land is not founded on matter of record, nor upon express contract. It is merely implied from the presumed intentions of the parties. It is purely a creature of equity; and is indifferently treated as a natural equity, or a trust. *Gilman* v. *Brown*, 4 Wheat. 272; 7 Ib. 46. But whether it be regarded as a natural equity, or a trust, its very nature implies the existence, in the vendor, of a title, either legal or equitable, to the land on which it attaches. A lien is a qualified right, which one, in a given case, may exercise over the property of another. 6 East, 20. From its essential character, it is incapable of constituting title or property. Where the title is retained by the seller, though bond be given conditioned to convey the land on payment of the purchase-money, it is evident no lien in his favor can exist. It would be absurd to say that a party has reserved a lien in respect to that of which he has never divested himself of the ownership, or conveyed the title. When a party who has contracted for the sale of land, gives bond to make title when the purchase-money is paid, on a failure of the purchaser to comply with the terms of the contract, he may, under certain conditions, be entitled to consider the contract at an end ; and where possession was delivered, bring ejectment to recover the land ; or he may proceed in equity to rescind the contract. He might, perhaps, also, where there has been part performance on the part of the purchaser, on

Servis *v.* Beatty et al.

a showing of his insolvency, be permitted to treat the transaction as a *quasi* mortgage, and file a bill to foreclose against him. But in the various ways in which he might elect to pursue his remedy, he would proceed on the ground that he was the actual owner of the legal title, and not as asserting a lien against the party holding it.

The equitable lien of a vendor of land is based· upon the presumed intention of the parties. " The rule," says Judge Story, " is manifestly founded on a supposed conformity with the intentions of the parties, upon which the law raises an implied contract; and therefore it is not inflexible, but ceases to act, when the circumstances of the case do not justify such conclusion." Under this rule it is held, that where one sells and conveys land without taking security for the purchase-money, from the vendee, the law presumes it to be the intention of the ·parties that the land shall stand charged with the vendor's lien, and upon that presumption raises an implied contract to that effect between them. But where,. for any reason, such, for instance, as the taking security by the vendor, no such presumption arises,—the law ceases to act, and no, implied contract is raised.

According to this view of the subject, *it is* perfectly clear that the lien of a vendor did not attach to the land in the hands of Beatty. It follows, hence, necessarily, that if a lien existed, in reference to Killingsworth, it must have arisen from circumstances independent of, and disconnected with the original sale by the intestate. If no lien attached when the sale was made, there is no pretence for insisting that a lien was created by the mere fact that . Killingsworth bought the land with notice of the non-payment of the purchase-money.

But if, as argued by the counsel for the appellees, and strenuously denied by the other side, that when a party having sold land, gives bond to make title on the payment of the purchase-money,. and dies without having made the conveyance, the Court of Probate, on proof of the payment of the purchase-money, has jurisdiction to order the legal representative to make a deed for the land, to the purchaser, we have no doubt, under the facts disclosed, that. Beatty took the land subject to the vendor's lien.

VOL. III.—6

For on the assumption of jurisdiction in the court, the deed made in execution of the decree, which was doubtless procured by fraud, was not absolutely void, but voidable at the instance of the parties to be affected by it. It vested, *de facto*, the legal title in Beatty. Hence the parties interested at their election, were entitled to treat it as a valid conveyance, and to insist that the vendor's lien attached to the land in Beatty's name, if the circumstances justified the claim.

It, therefore, becomes necessary to determine the question of jurisdiction. The authority of the Court of Probates in certain specified cases, and under prescribed conditions, to order the executor or administrator to make a deed for the land, is conferred expressly by the statute of the 26th Nov. 1821, enacted under the first Constitution of this State; the 7th sec. 4th art. of which declares that the legislature should have power to establish in each county within this State, a court of probate for the granting letters testamentary and of administration, for orphans' business, for county police, and for the trial of slaves. All laws in force within this State, at the adoption of the revised Constitution, not repugnant to its provisions, were expressly continued in force by the convention. The inquiry then is, whether this act, so far as it conferred the specific jurisdiction in question, is not in conflict with the revised Constitution, and therefore annulled by it.

In support of the affirmative of this proposition, it is insisted that the authority to decree a specific performance of a contract is, by the Constitution, confided exclusively to the Court of Chancery; and that by the act itself, the heirs-at-law are not required to be made parties to the proceeding, and hence, against the provisions of the bill of rights, may be deprived of their property without due course of law.

The Constitution, in creating the several courts, has defined, in very general terms, the jurisdiction confided to each. It declares that a superior Court of Chancery shall be established, with full jurisdiction in all matters of equity. But it has not attempted to define what shall be matters of equity jurisdiction. So in regard to the Court of Probates, it declared that they shall have jurisdiction in all matters testamentary and of administration, in orphans'

Servis *v.* Beatty et al.

business, and the allotment of dower, in cases of idiocy and lunacy, and of persons *non compos mentis;* without laying down any rule by which the legislature and the courts are to be guided in ascertaining what subjects pertain to any one of these branches of jurisdiction. As the jurisdictions of the several courts are derived by express grant from the Constitution, they must, of necessity, be separate and distinct, and in a certain sense exclusive.

When the object, in a given case, is to ascertain if a court—the Court of Chancery for instance, as, in general terms, its authority has been extended to all matters of equity—has jurisdiction, recourse must be had elsewhere—to acts of our own legislature, declaratory of the powers and jurisdiction of the court; to other systems in which the principles of equity jurisprudence are applied, and the subjects of equity jurisdiction defined. And if, upon such reference, the subject is found to be one of equity cognizance, it may be safely concluded that the court has jurisdiction. But we apprehend it would be going very far to assert that because the Court of Chancery was thus ascertained to have the jurisdiction, that such jurisdiction would, necessarily, be exclusive. If such were the doctrine, it is manifest that all concurrent jurisdiction between the courts would be put an end to, and very serious and injurious consequences would ensue. Doubtless the jurisdiction confided to each of the several courts, in the main, is exclusive, and it is the manifest policy, as well as our duty, to confine them within their appropriate spheres. But it never was, in our opinion, the intention of the framers of the Constitution to deny to the Court of Chancery jurisdiction over a given subject, for the reason that a court of law, according to settled rule, could take cognizance of the same. Nor to oust the jurisdiction of a court of law because the Court of Chancery, upon the well settled doctrines of equity, might entertain jurisdiction over the same subject. The lines which mark the boundaries between the powers of the courts of law and equity, are frequently so indistinct that, sometimes, the most difficult question in a case to decide, is the question as to which of the courts cognizance of the case belongs. A court of law may have undoubted jurisdiction of a given case, but if the legal remedy be embarrassed or supposed to be inadequate, equity

will assume jurisdiction. And when the subject-matter of contest is held by a single individual, in opposition to a number of persons who contest his right, and who hold separate and distinct interests, depending upon a common source, a court of equity will assume jurisdiction, though his title be legal, and the remedy at law perfect, as to each of the persons who claim in opposition thereto. In those instances, and numerous other cases which may be put, if the jurisdiction of the courts in the unqualified sense of the term be exclusive, it is clear that the right to apply the remedy belongs to one, in entire exclusion of the others. In all such cases, what rule is to govern in determining in which court the jurisdiction attaches? In regard to those subjects which are recognized by the prevailing systems of jurisprudence to pertain exclusively, either to the courts of law or to the courts of equity, no difficulty would be encountered. But the least reflection must convince, that no satisfactory rule can be laid down, by which it is to be determined whether the jurisdiction has been exclusively appropriated to the Court of Chancery or to the courts of law, in reference to those matters over which those courts possessed concurrent jurisdiction at the date of the adoption of the Constitution. The impracticability of laying down such a rule, seems, of necessity, to compel the adoption of the plain, manifest, and natural construction.

The Constitution, in the fourth article, vests the judicial power in the several courts therein provided for, and, in very general terms, prescribes the jurisdiction of each; hence, referring to the legislature and to the courts themselves the duty of determining the specific subjects embraced by their respective jurisdictions. What those subjects were, it is evident could only be ascertained by consulting the systems of jurisprudence existing elsewhere. Those systems were present to the mind of the convention when it undertook to provide for the organization of the courts, and to prescribe the powers which they should respectively exercise. Where, therefore, jurisdiction was given to the Court of Chancery in matters of equity, all subjects were embraced, which, by the standards referred to, were held to be. matters of equity cognizance. And so with reference to all the courts created by the

Constitution. This conclusion is undeniable; and the result is a necessary one, that where, under the systems of jurisprudence prevalent when the Constitution was adopted, the jurisdictions of the courts of law and equity were either exclusive or concurrent, the jurisdiction of the several courts created by the Constitution, was vested in the same way; that is, the jurisdiction was either concurrent or exclusive, as it was recognized to exist under those systems; subject, however, to modifications, expressly provided, and to restrictions implied from our own peculiar system.

It is conceded that the power to decree the specific performance of a contract, is an authority which necessarily pertains to a court of equity. And it is assumed that the decisions of this court, in *Blanton* v. *King* and in *Carmichael* v. *Browder*, has settled the doctrine that the jurisdiction of the Court of Chancery, as to all matters confided to it, is exclusive. Hence, it is insisted that the right claimed in virtue of the statute for the Court of Probates, is denied by the Constitution.

In the cases above referred to, the pretension was, that the Court of Chancery possessed concurrent jurisdiction in all matters confided to the Court of Probates. This was denied, and the rule settled that, in cases in which the subjects involved are, in their nature, strictly matters testamentary or of administration, and where the court is competent to give relief, the Court of Probate possesses original and exclusive jurisdiction.

It is true, that the language employed in those cases may seem to justify the opinion that the jurisdictions conferred upon the respective courts was not only separate and distinct, but, in the unqualified meaning of the term, exclusive.

But if such was the opinion then entertained, and if, in point of fact, it was intended to announce the doctrine in the broad terms in which it is contended for, it is sufficient to say, that it has since been frequently disregarded, and never in a single case recognized and acted on.

The extent of the powers vested in the Chancery Court is, therefore, no test of the extent of jurisdiction in the Court of Probates; because the Court of Chancery possesses jurisdiction, gene-

rally, to decree the specific performance of contracts relating to land, it does not follow that the Court of Probates is not vested with the same authority in respect to the cases provided for in the Act. To determine the jurisdiction of any of the courts, we must look to the Constitution, the common source of the jurisdiction of all; and we there find, that the Court of Probates is clothed with full authority over matters testamentary and of administration. The question, hence, arises, whether the power claimed for that court in virtue of the act, is jurisdiction in relation to matters testamentary or of administration.

The difficulty is admitted of determining what subjects are comprehended by the terms "matters testamentary or matters of administration." The Constitution has prescribed no rule. And as it is competent for the legislature to prescribe the powers, or rights, and the duties of executors and administrators, it is manifest that the import of these terms may be more or less comprehensive, according to the prevailing system. The undivided lands of a decedent descend to his heirs; and hence are not, generally, a matter of administration. But under the conditions prescribed in the statute, they become as much a matter of administration as the personalty of the intestate. Whenever the legal representative of a decedent is charged with a duty in reference to his real estate, the real estate, of necessity, becomes a matter of administration. And the title which is requisite to the discharge of that duty, vests in the representative, by operation of law.

Where the owner of land gives bond to make title on the payment of the purchase-money, he has elected to convert his land into money—his realty into personalty; and when the money is paid, the beneficial interest becomes completely vested in the purchaser. Nothing but the mere legal title remains in the vendor, which would not be available, in law or in equity, either to him or his heir. *Brown* v. *Weart*, 7 How. 181; *Morey* v. *Torrey*, 7 S. & M. 22; *Harman* v. *James*, 7 Ib. 111. The case, we apprehend, would not be in the slightest degree altered, where the money was paid to his administrator instead of the vendor. In the latter case the heir could get up no claim to the purchase-money, and the mere naked legal title, if in such case it could be regarded as a

descendible estate, would be unavailing against the beneficial title
of the purchaser. In the former, the heir would be entitled to the
proceeds of the land, which his ancester had determined to convert
into money. At all events, he would not be entitled to claim both
the land and the money; and the receipt of the latter by the ad-
ministrator, would effectually preclude him from using the naked
legal title for any beneficial purpose whatever.

In such cases, the law having vested the Court of Probates with
jurisdiction to compel the administrator to make the title, it must
be considered that he was vested with the title requisite to enable
him, under the sanction of the court, to execute the contract of
his intestate. The case is not materially different from those in
which the administrator is required and authorized to sell and con-
vey the real estate of the decedent to pay the debts.

We think, therefore, that the authority, claimed for the Court
of Probates, in such cases, to compel the administrator to make
the title, may be considered jurisdiction in a matter of administra-
tion, and hence was conferred under the sanction of the Constitution.

This seems to have been the ground upon which the legislature
proceeded in 1821. The validity of the Act of that date was never,
as far as we are informed, brought in question. And when the
revised Constitution was adopted, the presumption exists that the
convention, in assigning the jurisdiction to the Court of Probates,
intended to extend it to those subjects which were, according to
the popular and legislative acceptation of the terms, matters testa-
mentary and of administration.

The remaining question to be considered is, whether the vendor's
lien passed with the land into the hands of Killingsworth, who
stands in the attitude of a sub-vendee, and claims to be a *bona fide*
purchaser for a full and valuable consideration without notice of
the claim to a lien upon the land.

A question is made upon the sufficiency of the averments in the
answer, to entitle Killingsworth to protection as a *bona fide* pur-
chaser, for a valuable consideration, without notice. The answer
contains no averment that the purchase-money was all paid before
notice of the vendor's equitable lien. If Killingsworth had chosen
to make this defence by plea, instead of answering the lien, accord-

ing to some of the adjudged cases, the defect would have been fatal. (Eq. L. C., vol. 2, p. 83; cases cited.) But having chosen to answer, it is well settled that the defence will be good, if substantiated by proof. Upon the question whether, to entitle a purchaser to protection, the consideration of the purchase must all be paid or not, the authorities are not agreed. The rule held in Pennsylvania that payment of part of the purchase-money before notice, although not sufficient to invest the vendee with the character of a *bona fide* purchaser, as it regards the estate purchased, gives him the right to invoke the aid of the equitable principle, that he who would claim equity, must do equity, and requires reimbursement from the owner, as the condition of giving way to his title, seems better to accord with the principles of justice and reason. *Youst* v. *Martin*, 3 S. & R. 428; 10 Watts, 13. In the case of *Wood* v. *Mann*, 1 Sum. 505, the same doctrine is recognized. And in *Frost* v. *Beekman*, 1 John. Ch. 288, it was held that part payment of the purchase-money, before notice, would entitle the purchaser to the land itself, subject to a lien in favor of the antecedent equity defeated by the purchase.

The answer contains an explicit and direct denial of all knowledge of the fraudulent transactions alleged to have occurred between the administrator and Beatty; and of all knowledge and even a suspicion that the purchase-money was not fully paid when Killingsworth made the purchase. The answer avers further that Killingsworth paid before notice of the claim to the lien upon the land, a sum in part payment of the purchase-money, which the evidence shows, that at the time of taking the depositions was equal to the value of the land. And further, the bill contains no allegation that Killingsworth had not paid every cent of the purchase-money. Upon the whole, therefore, we think, the defence made by the answer, if sustained by the proofs, entitled him to protection.

We deem it unnecessary to go into a minute examination of the evidence. It is sufficient to state that upon a careful examination of it, it was clearly insufficient to sustain the allegations of the bill. And, hence, that the decree of the chancellor should be affirmed.