Robert Huntington et al. v. W. A. Allen et al.

1. EQUITY—CLOUDS ON TITLE.—He who comes into a court of equity to get rid of a legal title which is alleged to overshadow his own, must show clearly the validity of his own title and the invalidity of that of his opponent.

2. SAME—ORIGIN OF JURISDICTION TO REMOVE CLOUDS.—The jurisdiction of courts of equity to remove clouds from titles takes its rise in the doctrine of *quia timet*, in order to give repose and peace to the party in possession by virtue of a rightful title, against him who would harass with suits after the "right" had been fairly tested, or against evidence of title fraudulently obtained.

3. SAME—STATUTORY JURISDICTION.—It is scarcely to be supposed, that the enlarged rule of the statute was meant to confer upon the chancery court, the right to adjudicate upon the relative value and merits of conflicting titles under all circumstances. If the parties are already in a court of law, and can fairly present their respective titles in that court, which are of such character as will there be recognized, and no special reason is presented for equitable interference, the latter court might well leave the case to the law tribunal.

4. SAME—CLOUDS AND DOUBTS.—Only at the suit of the true owner will the clouds and doubts that fall upon his title from pretended adversary claims be removed.

5. REGISTRY LAWS—U. S. LAND LAWS.—Our registry laws do not embrace certificates of entry or purchasers and assignments, and patents made and issued under the U. S. land laws. 31 Miss., 323.

6. JUDGMENT—ENROLLMENT.—The act of 16th February, 1841, took effect from its passage as to all after rendered judgments, and went into effect July 1st, 1841; as to those recovered before its passage after this act went into operation, unless the judgment was enrolled in the county where the debtor's property was situated, there was no lien, except such as was incepted by the levy of the execution and consummated by the sale.

7. EQUITY—CLOUDS ON TITLE—FRAUD—Gross inadequacy of price is a badge of fraud, which, while it might not enable the courts to declare the title to land void, will yet restrain them from lending their aid to remove clouds from such a title.

8. SAME—JURISDICTION—STATUTE OF LIMITATION.—Adverse possession for so long that the right of entry is barred under the statute of limitations, is a matter peculiarly in the province of a court and jury, and when that question is pending in a court of law, it would not be proper for a court of equity to withdraw it.

9. ADVERSE POSSESSION—TITLE.—To support a title by adverse possession, there must have been an actual entry, so as to give all interested and the public notice of the claim of property, and such use of the *locus in quo* as it was susceptible of.

Appeal from the chancery court of Leake county. CAMP-BELL, J.

The facts appear in the opinion of the court.

*Robert Huntington*, and *William Yerger*, counsel for the appellants.

The claimant, Huntington, claims to have been a *bona fide* purchaser, etc., without notice, etc., with the money paid, etc. As alleged in the bill, the complainant, Huntington, purchased the lands in question at sheriff's sale as the property of Asamus L. Nash, on the 20th day of September, 1841, and that there was nothing of record in the United States land office, in Columbus, Mississippi, before the 12th day of April, 1843, to show that the said Nash, the original purchaser of the said lands, had transferred his certificates therefor to any person or persons whomsoever.

In the case of Martin v. Nash, 31 Miss., 324, the high court presumed that the transfer of the land certificate ought to be noted in the tractbook alongside of the original entry of the land in question, and also presumed that it was so noted. Nothing of the kind was so noted in the tractbook or otherwise in the land office of the original entry, etc. And so in the cause of Huntington et al. v. Grantland & Anderson, 33 Miss., 433; nothing of the kind was so noted in the tract-book or otherwise in the land office of the original entries of the lands in question. And there being no ground for the latter presumption of the court in the cause of Martin v. Nash. The high court in the cause last cited virtually decided as a rule for the assignments of land certificates, "that the assignor of land certificates must cause to be placed on record proper evidence of this assignment in the land office where the original entries of the lands were made."

In the case of Lindsey v. Henderson, the judgment against Forniquet was rendered after his conveyance of the land to Henderson; but for the want of notice of that conveyance, the judgment, against Forniquet, became a lien on the land

conveyed to Henderson. So in the cause of Huntington et al. v. Grantland & Anderson, 33 Miss., 453, the judgment, against Walthall was after his assignment of his land certificates to Grantland & Anderson, but for the want of notice of those assignments, the judgment against Walthall became a lien on the lands so assigned.

So in this case, the judgment against Asamus L. Nash accrued by operation of law—his assignments of his land certificates to Charles Gascoigne. But for want of notice of those assignments, the judgment against Nash became a lien on the lands so assigned. Botters v. Eddington, 30 Miss., 580.

Huntington's vendees were innocent purchasers and full performance of their executor's contracts was arrested on the 4th of July, 1858; and the court in sustaining the demurrers to the bill, instead of dismissing the bill, should have ordered an account to be stated, etc., and a reimbursement decreed to be made by the defendants of all moneys, etc., paid to their vendor, Huntington, before they received notice of defendant's claim as prayed for in bill. Servis v. Beatty, 36 Miss., 53; Kilcrease v. Lum, 36 Miss., 569,

The vendees of the complainant, Huntington, were in actual adverse possession of the lands in question, claiming the same under Huntington's title before and at the time (17th Oct., 1857), Charles Gascoigne made his will, and before and at the time (16th Nov., 1857) of his death, and in the meantime Charles Gascoigne was not legally seised of the same, nor had constructive possession thereof. 6 Cruise (N. Y. ed., 1835), title 38, ch. 3, pages 34, 35, 36 (82, 37); 4 Kent, 323, 324, 337, 339. Interest and power in same person, 4 Kent, 334, 335, 336.

If the power was valid at its creation, it is doubtful whether it was extinguished by the deed of the heirs to Hooper & Allen. 4 Kent, 339, 346, 347, 348; 6 Cruise, title 38, ch. 10, pages 171, 223; Code, 458, art. 136.

The law deems every person to be in the legal seizure and possession of land to which he has a perfect title, and this seizure and possession is co-extentive with his right and so

continue till he is ousted therefrom by an actual possession in another, under a claim of right.  Angel, on Limitation (2d ed., Boston) 400, 405 ; 6 Peters U. S. R., 743; 5 ib. 1354 ; 2 Wheaton, 29 ; 8 Cowen, 589.

By reason of the aforesaid actual adverse possession of the lands in question by Huntington's vendees, the said Charles Gascoigne was ousted from his legal seisin and possession of the same.  And the said power of sale was void in its creation, as would also have been a devise of the lands to Hooper and Allen, had such been made by Gascoigne in his will.

And by the uninterrupted continuance of said adverse possession from the day inclusive of Gascoigne's death to this present day, in this honorable court, his heirs were never in the legal seisin and possession of the lands in question, and consequently their deed of conveyance to Hooper and Allen, dated 23d April, 1859, is also void.

Heirs are precluded from making any defense which their ancestor could not make.  24 Miss., 612; 25 ib., 495 ; 27 ib., 531.

If the grantee's purchase is made from motives of speculation, and for a consideration grossly inadequate, and with an evident design to institute legal proceedings against the person in adverse possession, or otherwise to annoy, disturb or oppress him, in order to get him out of possession or to force him into a compromise at a great sacrifice on his part, and to the great profit and advantage on the part of the grantee, such purchase is condemned as champertous, whether made for real or personal property, both in law and equity, and such grantee is not permitted to disguise the champertous character of his purchase by any of the forms of law or equity. Tit., Champerty 1 (1, 2, 3)—4, (30, 33, 51, 54) ; ib. 4 (14)— 11 (10)—12 (1).  Rives v. Weaver; 37 Miss., 474.  Indictable, 1 Russell on Crimes, 181, Boston ed. 1831 ; ib., tit., Champerty, 13 (8)—1, (6, 12, 32)—10 (8).  Ground for rescission of contract, tit. Champerty, 1 (80) ; parties in *pari delictu*, etc., ib., 1 (88) ; immaterial whether title be

good or bad, ib., 1 (53); seller is presumed to know situation of land, ib., 1 (44). Deed from disseised grantor. Same sort of title, U. S. Digest, tit., Champerty 4 (17), B. Monroe, (contra) 1 (63), J. J. Marshall, successor of B. Monroe as reporter, etc.

*Robert S. Hudson,* for appellees.

There is no right or relief involved by appellant's own showing for which he did not have his clear and complete remedy and protection at law, upon the trial of the eject-ment suits injured by his bills in this case.

In the case of Martin v. Nash, 31 Miss., 324, the question, and only question before this court was, "whether the registration laws of this state apply to certificates of entry of land from the general government, or to assignments thereof." This court very properly held in that case that the registration laws of this state did not so apply, and that so a purchaser of land, therefore, at a sheriff's sale made under an execution emanating from a judgment rendered against the original enterer and after the assignment of the certifi-cate of entry by him to a third person, will not acquire a good title, although he had no notice, either actual or con-structive, of the assignment.

There is no law of congress requiring the registration of transfer of certificates of entry or assignments in the local office. If there be such a law, it was never enacted or intended for notice to purchasers at public or private sale, but to har-monize, systematize, and dispatch the business between the local and general land offices and the holder of assigned certificates.

There was a rule of the general land office requiring local officers to register assigned certificates, but this was only to inform the general land office how to issue patents.

The assignee in this case is not in default. The govern-ment officer failed to provide the book. Shall the failure of the government and its officers defeat the rights of the as-signee? The patent was issued before the levy and purchase,

and was a great public act of the government and notice to all the world that the title was in the patentee.

The case of Huntington v. Grantland was very properly and correctly decided upon the state of the case, as appears in the report. But it certainly does not decide that where the certificate was assigned, and the patents issued and recorded in the name of the assignee before the levy and sale or lien of judgment, that the purchaser at sheriff's sale afterwards acquired title simply because the assignment was not registered in the land office at Columbus, and that too, when no such registry was kept or could be had by the assignee, and the assignee was in no default.

The case of Lindsey v. Henderson, 27 Miss., 502, sustains our view of registration of assignment in land office; and that the assignee held the perfect title and drew to him the patent, upon the assignment, when no prior lien attached.

We insist that Huntington does not stand in position to assert for himself the doctrine applicable to *bona fide* purchasers for a valuable consideration, without notice. He did not buy directly from Nash, but at sheriff's sale. Henderson v. Downing, 24 Miss., 106. The doctrine of *caveat emptor* applies to him.

We deny that Huntington was a *bona fide* purchaser for a valuable consideration. He was the attorney of O. L. Nash, in the very case under which the lands were sold. The execution under which they were sold was against Nash, for cost taxed in his recovery against Henly, and without being issued first to the county of Nash's residence, and which the attorney must be presumed to have known, and should have arrested, if illegal or likely to be to the prejudice of his client. Between three thousand and four thousand acres of valuable lands were levied on, simply to pay this cost of about thirteen dollars, and sold, and purchased at such sale by Huntington, for less than three-eighths of a cent per acre, and less than the cost for which it was sold. This certainly shows a bad case of *bona fides* and valuable consideration. Byars v. Surget, 19 How. S. C. Rep., 203; Baldwin v. Jenkins, 23

Miss., 206.    Where property is sold under execution for less than half its value, the title is presumed defective, and so understood by the bidders.    Baldwin v. Jenkins, 23 Miss., 206.    Huntington, from the mere fraction of a cent, paid for the land, the enormous levy made for so small a sum, must be held to have known that the title he was buying was defective, and it was so known to others present at the sale, and the bidding was regulated thereby, and hence neither a *bona fide* purchaser, nor a purchaser for a valuable consideration, nor a purchaser without notice of the rights of others, but a *mala fide* purchaser without consideration, and with notice.

It was the right and duty by the statute to issue execution for the cost taxed against Nash " to the county of his residence."    Hutchinson's Code, 475, § 5.    But this was not done, as the exhibit of the records of the judgment and executions showed ; and for this reason, the levy and sale were bad, and passed no title.

If the taxation of cost was a judgment—and it certainly has the force and effect of one—there was no lien on the lands of Nash in Leake county until there was an actual levy of the execution thereon.    The levy was made in August, 1841, and the sale in September, 1841.    The statute, usually called the " abstract law," was enacted the 16th February, 1841 ( Hutchinson's Code, 890, §§ 1, 2, 3), and took effect immediately as to all judgments obtained after its date, and on the first of July, 1841, as to all passed or antecedent judgments.    No enrollment appears to have been made in accordance with this law.

As to the statute of limitations, champerty or maintenance, improvements and payment therefor, the complainant's remedy and relief, as to each, is full, clear, and complete at law, and matter to be heard and decided on the trial of the ejectment suits.

SIMRALL, J.:

H. Henley, on the 28th of March, 1838, recovered judgment in the circuit court of Attala county against Nash for

over two thousand dollars. Execution on this judgment was, the same year, returned by the sheriff of Attala, *nulla bona;* subsequently, *fieri facias,* at the suit of the officers of court, for costs taxed, was issued to the county of Lowndes, and returned "no property found." An *alias fieri facias* for costs was directed to the sheriff of Leake, who, in July or Aug., 1841, levied upon the lands in controversy, and, on the 20th of the following September, sold them to Robert Huntington for $13 75; the tracts consisting of several parcels, being subdivisions of sections, and contained over 1,000 acres. They were purchased by Nash from the United States, on the 18th of April, 1836; who, on the —— day of June of the same year, assigned his certificate of entry or purchase to Charles Gasgoigne.

No entry was made on the tractbook, or other registration in the local land office at Columbus, of the assignment. But on the —— day of August, 1843, a paper was made up at the general land office at Washington city; of all the assignments of certificates issued at the Columbus office, and forwarded by the commissioner to the registrar, with instructions to note on the tractbook assignments as made. It appeared on this paper that Charles Gasgiogne was assignee.

Huntington, on the 20th of December, 1852, sold a parcel of the land to Presley, who sold to Jones. On the 29th of September, 1856, Huntington sold another parcel to Jones. The 10th of January, 1858, a parcel was sold to Stephens, and another to Jones.

To the February term, 1860, of the circuit court of Leake county, Johnson M. Hooper and Christopher C. Allen, brought actions of ejectment against the tenants in possession of the several tracts, who derived title either mediately or immediately from Huntington.

Huntington and the defendants to the several ejectment suits, brought their bill in chancery, enjoining the suits at law. The plaintiffs in the ejectments, on the application of Huntington, filed an abstract and copies of their documentary title, which was derived from Gasgoigne. The bill makes

exhibits of the several ejectment suits, and sets forth the title under which the plaintiffs claim, making exhibits of the several documentary evidences thereof. The actions at law were at issue, and ready for trial. The prayer of the bill is for a perpetual injunction of the ejectment suits, and that the muniments of title of the plaintiffs therein may be cancelled or set aside, as casting a cloud on the title of the complainants, or some of them.

The statute in reference to the removal of clouds from title, enlarges the principle upon which courts of equity were accustomed to administer relief. It is very broad, allowing the real owner in all cases, to apply for the cancellation of a deed or other evidence of title, which casts a cloud or suspicion on his title. It is an ancient and well established rule, both in courts of law and equity, that a party must recover on the strength of his own title, and not on the weakness of that of his adversary. Watts v. Lindsay, 7 Wheat. 242. The principle is very aptly stated in Banks v. Evans, 10 S. & M., 62 : "He who comes into equity to get rid of a legal title, which is alleged to overshadow his own title, must show clearly the validity of his own title, and the invalidity of his opponent's." Nor will equity set aside the legal title on a doubtful state of case. In further exposition of the same principle, it was declared in Boyd v. Thornton, 13 S. & M., 344 : "The complainant must be prepared to sustain the entire fairness of his own title." The jurisdiction takes its rise in the doctrines of *quid timet*, in order to give repose and peace to the party in possession, by virtue of a rightful claim or title against him who might vex and harrass with suits after the right had been fairly tested in a court of law, or against a deed or other evidence of title, which had been fraudulently obtained, and which might be set up after the evidence which could manifest its true character had become obscure, or had passed away. The terms used in the statute, expressive of the scope of the jurisdiction, viz.: " cloud," " doubt," " suspicion," quite distinctly imply that the instrument which creates them, is apparant rather than

"real;" is "semblance" rather than substance; obscures rather than destroys or defeats.

It is scarcely to be supposed that the enlarged rule of the statute was meant to confer upon the chancery court the right to adjudicate upon the relative value and merits of conflicting titles under all circumstances. That would be in effect, to draw into that court, from the courts of law, and the jury, the trial of ejectments. Nor do we suppose that it is, in all circumstances, in the election of either party to an ejectment pending for trial, to appeal to the chancellor for an injunction, and transfer the litigation to his court. If either party relies upon a perfect and complete equity which ought to draw to it, or control the legal title; or if either party depends upon a deed or other muniment which has been obtained by fraud, then the chancellor might assume cognizance over the controversy. Without attempting to state all the circumstances and conditions (which it would be imprudent to attempt), which would justify the injunction, it will suffice to say, that if the parties are already in a court of law, and can fairly present their respective titles in that court, which are of such character as will there be recognized, and no special reason is presented for equitable interference, the latter court might well leave the case to the law tribunal.

If these tenants in possession could as availably use their title in defense of the ejectments as in this chancery suit for injunction and cancellation, then it is not perceived that the forum of the litigation should be changed. If, however, they had a superior equity, which ought to draw to it the title of the plaintiffs in the ejectment, or which would make it unconscientious for such plaintiffs to set up against the equity, then a proper case for relief exists. Boyd v. Thornton, 13 S. & M., 344.

Certainly the complainants ought to show a complete equitable title, or a perfect legal title, that they are in the words of the statute, the "real owner" in one right or the other. What is this title? Nash entered the lands in April,

1836. He assigned in June of the same year his certificate to Gascoigne, to whom the patent was isssued, 27th February, 1841. The title of Gascoigne is either outstanding in his heirs or devisees, or it has passed to his assignees. If the several defendants to those suits have been in the adverse possession of the several premises a sufficient length of time to take away the right of entry, and bar a recovery, that fact also would at law defeat the recovery. So it may be answered, as to the other objection taken in the bill to the title, viz.: that because there was no evidence in the land office at Columbus of the assignment of the certificate of his entry and purchase, by Nash to Gascoigne, at the date of the recovery of the judgment, and of the levy and sale of the lands, as the property of Nash, that therefore, the assignment was void as to the judgment, and the lands were still liable to this judgment. If that be so, a legal title under our statutes passed to Huntington, purchaser at the sheriff's sale; such title as would support an ejectment, or successfully defend the possession· A certificate of purchase from the United States is made by the statute evidence of a legal title. The act of 22d June, 1822, Hutch., Code, 859, makes the certificate evidence of legal title, either in behalf of the original purchaser from the United States or of his assignee, the latter taking a title of the same nature and co-extensive in merits with that of the assignor. Lindsay v. Henderson, 27 Miss., 507. Although not as conclusive as a patent, it is sufficient to stand upon in a court of law. If, therefore, the title of Nash did not pass to Gascoigne in the circumstances stated, as against the judgment, but was subject to sale under it, then the sale (if not for other reason obnoxious) was sufficient to pass title to Huntington, and would be ample to protect the tenants on the trial of the ejectments. It does not appear essential for the security of the complainants, or any of them, on either of these grounds taken in their bill, for chancery interposition, admitting the grounds to be well taken in point of law.

The doctrine is founded in manifest reason and propriety, that complainant in such a suit must prefer a perfect title, legal or equitable. If he fails to satisfy the court that he is the real owner, he establishes no claim to relief, however many flaws, defects, and infirmities he may point out in the title of his adversary. It is only at the suit of the true owner that the clouds and doubts that fall upon his title from pretended adversary claims will be removed.

We are not aware of any act of congress requiring a record of the assignment of certificates of purchase to be kept in the local land office. There is manifold convenience that some such registry should be kept, and the regulations require it to be done. Nor are we aware of any legislation which attaches any consequence whatever if the registrar of the local office omits to note on the tract book an assignment, or which requires any registration in his office. The assignment is made on the original certificate, and is attested so as to furnish evidence to the general land office, to whom to issue the patent.

Nor do our registration laws embrace either the certificate or patent. The doctrine of notice does not then apply to this case. Gascoigne acquired a complete equitable title under the laws of the United States in 1836, long before the recovery of the judgment againt Nash. That equitable title was recognized by the government which confirmed the land to him by patent in 1844.

Martin v. Nash, 31 Miss., 329, presented essentially the same questions made here. It was a controversy between the assignee and a purchaser at sheriff's sale under judgment against the original enterer and purchaser. There was no record or evidence in the local land office of the assignment, nor was the certificate and assignment recorded in the county where the lands were situated. Because of these facts it was urged for the purchaser at sheriff's sale that the title of the assignee was a secret, undisclosed equity which did not affect the purchaser from the sheriff, who paid his money in ignorance of it. The court pronounced in favor of the assignee,

because under the act of 1822, already referred to, the assignee took a legal title; and because the registry laws had no application to such muniments of title. It was said that recording the certificate and assignment in the probate clerk's office would not have been notice to subsequent purchasers. Such also is Talker v. Jones, 12 Ala., under a statute similar to ours.

4th. Can the complainant's title stand another test?

The judgment did not create a lien on the lands until an actual levy and sale (on the hypothesis that they were liable to sale under the execution). The judgment was recovered in Attala county, the lands were in Leake county. By the act of 16th February, 1841, all judgments are required to be enrolled, and took effect from its passage, as to all after-rendered judgments. As to those recovered before its passage, it went into effect July 1st, 1841. Unless enrolled in the county where the debtor's property was situated, there was no lien. It is not shown by the bill that this judgment was enrolled in the county of Leake. There is no lien disclosed then, upon these lands, except such as was incepted by the levy, and consummated by the sale. The levy was made in August, and the sale in September, 1861; but before the lien attached the legal title was fully vested in Gascoigne by the issuance and recording of his patent. In this aspect of the title of Huntington, his purchase at the sheriff's sale conferred no estate, either legal or equitable. But the title of complainants must be "free from suspicion," as declared in the authorities quoted. Can this be predicated of Huntington's claim with confidence? For the trifling sum of $13 75, about 1,000 acres of land, subdivided in fractions of sections, were sold in the aggregate. The levy on the face of it was grossly excessive if the titles were good. Nash had paid the government $1 25 per acre in 1836. A single quarter section ought to have been ample to satisfy the costs. There does not seem to have been any regard to the interests of the debtor. Instead of attempting to realize, out of a single fraction, or two fractions, all were exposed at once, and

bought in for a "pepper corn." We do not say that these circumstances invalidated the title, but do they not cast a strong shade of suspicion upon it? To the degree as to make a court of equity slow and reluctant to intervene in its behalf, and incline it to leave the party to make the best use of it he can in a court of law. In Byers v. Surget, 19., How. S. C. Rep., 311, remarking upon the sale of a large body of land for a very small sum on an execution like this, it may be remarked, for costs, the court said: "It is insisted that inadequacy of consideration singly cannot amount to proof of fraud. This position is hardly reconcilable with the qualification annexed to it by the courts, namely, unless such inadequacy be so gross as to shock the conscience." Remarking upon a sale of land, for less than half its least value, in Ingraham v. Regan, 23 Miss. Rep., it was characterized by the court as a circumstance, though not very conclusive, from which it may be inferred that the bidders at the sale were not ignorant of the fact that the title was not perfect.

But again, it is averred in the bill that the title of the tenants has been perfected by the statute of limitations. If that be true, their defense to the ejectments is complete and unembarrassed. Certainly, the purchasers from Huntington went into possession under color of title claiming to hold adversely to Gasgoigne. If Huntington held in such wise as in law would amount to an adverse possession, those coming in, in privity of title and estate under him, would be entitled to the benefit of his possession, to be tacked on to theirs.

We fully recognize the doctrine, that title may be acquired, by adverse possession, held long enough to perfect it. If continuous, open and notorious, under claim of right, until all remedy, by lapse of time, is cut off from him who has the perfect paper title, then the right of possession has matured into a good legal title. To determine questions of this character is especially the province of a court and jury, and when that question is already pending in a court of law, we do not think that it would be proper

for a court of equity to withdraw it.   Indeed, it is a common
and approved practice, in suits of this character, to send
down to the jury an issue of fact, such as whether the deed
or other instrument complained of as a cloud was obtained by
fraud.

5th. As to the adverse possession. If the defendants
have been in possession of the several premises, adversely
to the plaintiffs in the ejectment suits, so as to bar the right
of entry, that matter is especially a proper subject for a
jury trial; and no reason is set forth in the bill that.
obstructs or hinders it, as a defense to those actions.

The proper title of these parties originated in 1841, by
the levy upon, and sale and conveyance of the lands to Hunt-
ington.   If Huntington and his alienees have been in the
open, notorious occupancy of the lands a period of time
long enough to toll the right of entry, and bar a recovery,
having entered under color and claim of title, then they
would have perfected title, by the entry, under color of title,
and occupancy.   The judgment and sheriff's deed would be
of no value, as conveying a valid legal title, but would be
competent to be referred to, as conferring a color and claim
of right.   Bledsoe v. Little, 4 How., 25.   The facts stated in
the bill, in support of the adversary possession, is the pay-
ment of taxes on the lands, commencing shortly after the
sale to Huntington, occasional visits to the premises, and the
actual occupancy by the several vendees of Huntington,
from the date of their respective purchases, and the im-
provement by the erection of houses, clearing in part, and
cultivation.   It was held by Mr. Justice McLean, Ewing v.
Burnet, 1 McLean, 267, "that suing for trespass, or paying
taxes, and speaking publicly of the claim, are not sufficient
to constitute an adverse possession."   There must be an
actual entry, so as to give all interested and the public,
notice of the claim of property, and such use of the *locus in
quo* as it was susceptible of.   The same case subsequently
came before the supreme court of the United States, and is
reported in 11 Peters, 52.   In that court it was held that,

while the erection of houses, enclosure, or cultivation might not be necessary, there must be visible and notorions acts of ownership, for the proper length of time, with a proper color·of title. These acts must appropriate the property to such uses as it may be applied to, as cultivation, mining for metal or coal. We have already stated that the assignment of the certificate to Gascoigne vested in him the legal title, which was consummated by the patent; for that is conclusive, until set aside, that all preceding steps had been rightfully taken. This assignment gave to Gascoigne, under our statute, a legal seisin and possession of the lands embraced in the certificate, co-extensive with his right, although he was never in the actual .occupancy. This possession and seisin continued until interrupted by an actual ouster, and an adverse possession thereof. 4 How., 16 (cited *supra*). These lands remained in a wild state, unused for any practical purpose, until the occupancy under the several vendees of Huntington begun; prior to that time there had been no act of ownership by Huntington, except the payment of taxes, and an occasional visit to them. This was not an appropriation of them to some use for which they were fit, open and notorious, so as to create an eviction. We are, therefore, of opinion, that the statute of limitations commenced to .run from the date of the actual entry and occupancy by Huntington's purchasers.

We concur with the chancellor in sustaining the demurrer to the bill, and affirm the decree.