## P. BUCK, Ag't, *v.* PAINE & RAINES.

1. MORTGAGE — BY LESSEE FOR SUPPLIES — LIEN FOR LABOR. — The act of April 5, 1872, gives a " first lien in law " upon all agricultural products to secure payment of the wages of the laborer, whether to be paid in money or in products. It operates against the landlords and all other persons interested in such products. It takes effect as a limitation or restriction upon the power of the employer, by contract, mortgage or other act, to defeat this first lien created by law, to secure to the laborer his wages, out of the fruits of his industry, and the employer can create no other lien that will be paramount to it. A mortgage executed after the passage of this act is subordinate to the right of the mortgagor to employ laborers, and thereby by operation of law create the lien in their behalf, although such employment might be subsequent to the date of the mortgage. The act of February 18, 1867, was in force, until repealed in October, 1873.

2. SAME — SAME — PURCHASE FOR VALUE WITHOUT NOTICE. — Whatever will put a party upon inquiry, which if pressed with ordinary diligence and understanding, would lead to knowledge of the requisite fact, is notice of it. A subsequent purchaser or creditor about to deal with the property, if they have notice of a prior claim or equity, or of facts, which if followed up, will discover the truth, are put under a duty to make the investigation, and if they fail to do so, are charged with knowledge which the inquiry would have disclosed.

ERROR to the Circuit Court of De Soto County. Hon. E. S. FISHER, Judge.

The facts of this case fully appear in the opinion of the court. It is assigned for error :

1. In giving the instructions asked for by plaintiff.

2. In refusing the instructions asked for by defendant.

3. In refusing motion for a new trial.

*Harris & George*, for plaintiff in error :

1. We do not claim that the legislature has the power, or that the act of 1872 so means to give the laborer a lien on any part of the crop, to which his employer never had title. On the contrary, we admit that the employer of labor has no right by that, or any

other contract, to make a charge on the crop raiser, beyond any interest he may have had in it. We insist, however, that the legislature may, and has, by this act, regulated the priority of the liens, which a party having a crop or a partial interest in one, may create on his interest.

This power has been frequently exercised by the legislature, on the basis of the lien of mechanics. In reference to that lien, it has been held that as to the thing created by the labor of the mechanic, the legislature may give the mechanic, the creator, a prior lien over all others ; but at the same time, it has been held, that this lien shall not bind any interest in the land not in the employer.

2. The theory of the agricultural lien law is this, that as the crop is the creation of labor, the laborer shall be first paid out of the crop, to the extent of appropriating to him all the crop in which the employer ever had an interest, and wholly unincumbered by any contract by which he has attempted to incumber it. He who has taken a lien from the employer before the crop is created (and this must always be done if such lien be prior in time to the hiring of the laborer) knows that labor must be employed to create the crop, and that the law secures such laborer by a lien ; it must therefore be understood that he takes this lien, though prior in time, yet subordinate to the right of the owner of the crop to incumber it by contract necessary to create it. For without such labor the thing on which the lien is taken will never exist.

3. But independent of this, Buck is a purchaser without notice. The statement made to him that "there was some claim of some sort on it," was made by a stranger and conveyed no information to Buck. This information communicated no notice of an adverse title, nor did it give Buck the means of ascertaining who the adverse holder was. It was not intimated who was the adverse claimant, nor was any fact mentioned which could lead Buck to a knowledge of the claim. The mortgage was unrecorded, and if Buck applied to the records he would find no evi-

dence of an adverse party holding them. We think the notice wholly insufficient. See McLeod v. First Nat. Bank, 42 Miss., 99 ; Parker v. Foy, 43 Miss., 260 ; Shields v. Taylor, 3 Cushm., p. 21 ; 2 Am. Lead. Cases, p. 111, et seq.

*White & Chulmers*, for defendant in error :

We think that however this legal question might, in a proper case, be decided, the case at bar turns upon *the facts*, and that the verdict of the jury is right. Arlow Mince, a farmer, on February 14, 1873, executed to Payne & Raines, merchants, a mortgage on his crop, for supplies to draw to the amount of three hundred dollars, which mortgage was duly recorded. Several months thereafter, Thomas Mince, a son of Arlow, was employed by Arlow as a laborer, to be paid such part of the crop as disinterested men should adjudge to be right. Thomas Mince had both actual and constructive notice of the mortgage. He admits that he knew all about it. His family subsisted on the supplies, and J. A. Payne testifies that he furnished them to Thomas. The crop being made, two disinterested men, chosen by Arlow and Thomas Mince, without the knowledge of Payne & Raines, set apart for Thomas his part of the crop in the field. Thomas delivered one bale of cotton to the landlord Tait, and carried the bale in controversy to Nesbitt's Station, and sold it to Didlake, clerk of defendant Buck. Didlake was warned before purchasing, that the cotton was under mortgage; he consulted a lawyer, and remarked that " he would take the risk." Payne & Raines brought replevin, and recovered. That a jury of twelve honest men could render any other verdict, would seem impossible.

It is too evident to require argument that it was an attempt to defraud the mortgagee. Thomas Mince had promised to deliver the cotton to the mortgagee only two days before he sold it. In view of these facts, we say the verdict was 'right, irrespective of the legal question as to whether the lien of the mortgagee or of the labor on the cotton crop was superior.

The legal question is not presented by the record, and our client

is not to be prejudiced thereby.   The court below refused to decide the question because it was not presented.

The act creating the laborer's lien is to receive (secure) the payment of "wages for labor and liability for supplies." Acts of 1872, p. 131.   The mode of asserting the right is plain. If the lien for labor is superior to that of a prior mortgagee, which we expressly deny, it is evident that the mortgagor and the laborer cannot privately agree that the laborer shall receive a certain part of the crop, and thus defeat the mortgagee.

It would be monstrous if two of the parties in interest, without the knowledge or concurrence of the other, can assign away the agricultural products, and by sale, divest the mortgagee, more especially when, as in the case at bar, the stranger purchasing is informed of the mortgage before purchasing.   It will be seen that the only instruction given for the plaintiff, announced the doctrine that if Thomas Mince had any claim on the cotton crop of his father, it was a mere lien which was operating upon the entire crop, and that it was not competent for himself and father to set apart a particular part of the crop, and thereby give to him a perfect legal title thereto, divested of plaintiff's mortgage, and without the interposition of any court, and against plaintiff's consent. There is no error in this charge or in any part of the record.   The instructions asked for defendant below were not applicable to the facts, and were properly refused.

SIMRALL, J., delivered the opinion of the court.

Three questions are presented by this record:

First.   Whether a mortgage given by a lessee for supplies is superior to the lien of a laborer, employed by the lessee in its production, the mortgage being older than the contract to labor.

Second.   Whether a purchaser of part of the crop (1 bale cotton) from the laborer gets a good title as against the mortgagee.

Third.   Whether the purchaser (the mortgage not being recorded) had notice of the mortgage.

The mortgage was executed the 14th day of February, 1873, and included the crops to be grown that year by Arlow Mince.

On the 6th of April, 1873, Thomas Mince engaged to labor for his father, Arlow Mince, on the terms that his services were to be valued by two disinterested men, and so much of the crop set apart to him, as they should think right. Such valuation was made, and a part of the crop in the field was assigned to him, he to pay the rent proportionally to the landlord.

The bale of cotton sued for by the mortgagee was picked from the part set apart to Thomas Mince, and was bought from him by Buck.

Has Thomas Mince a lien on the crop, under his contract of the 6th of April, 1873, superior to the mortgage of February 14th, 1873? Thomas had actual notice of the mortgage, although it was not recorded.

The first section of the act of April 5th, 1872, p. 131, gives a "first lien in law," upon all agricultural products, to secure payment of the wages of the laborer, whether, as we have held at this term, to be paid in money, or in the "products." This lien shall operate against the landlords, * * "and all other persons interested in such agricultural products." This statute took effect from its passage, and impressed the lien in favor of the laborer, on the products, against all the acts and contracts of the landlord, lessee, or whatever may be the interest of the employer of such laborer, in the crops. It is denominated "a first lien in law;" to give it, therefore, the virtue and force intended by the statute, it must take effect, as a limitation or restriction upon the power of the employer, by contract, mortgage, or by other act to defeat this first lien created by the law, to secure the wages of the laborer, out of the fruits of his industry. Since he contributes his labor to bring the agricultural products into existence, or in gathering them or preparing them for merchantable use, or domestic consumption, or in their transportation, the law imposes a "first lien" upon them for his wages. The idea is that the crops

are produced and made valuable, fit for home consumption or market, by labor; therefore, labor shall be first paid. Whatever is over and above the demands of laborers upon it is subject to the control and disposition of the employer, whether landlord, lessee, etc.,   *   *   in any mode recognized by law. Whatever interest an individual may have in agricultural products, in "raising, handling, saving or transporting them," that person's interest is impressed with a lien for the wages of the laborer employed by or for him; and is a "first lien," in the sense that it is a limitation or restriction, upon the power of the employer, to create any other lien which shall be paramount to it. A mortgage for supplies would be inferior to the laborer's lien, for the intent and effect of the statute is to curtail and limit the dominion of the owner, or person interested, over the product, to the extent of liens that may arise in favor of those who bestow labor upon it.

The mortgage was executed after the passage of this statute. We therefore hold that it was subordinate to the right of the mortgagor to employ laborers, and thereby, by operation of law, create the lien in their behalf, and that, although such employment might be subsequent to the date of the mortgage.

We have recently (at this term) held that the act "for the encouragement of agriculture," of 18th February, 1867, was in force until repealed in October, 1873. The 13th section of the act under consideration declares, as the sense of the legislature, that all contracts under the act of February 18, 1867, are valid. Quite surely, they would be valid without such declaration. But we understand the legislature as saying, that we are introducing a new class of liens, which may come in conflict with those that have been authorized by the previous statute. Our intention is, that all contracts made under that statute shall stand and be valid. Our purpose is not to impair them.

The 7th section of the act of 1867, pp. 571, 572, makes it lawful to mortgage or convey in trust, a crop,   *   *   being produced or to be produced within fifteen months from the date of such

instruments. The intent of allowing such hypothecation of the crop so long in advance of its "being produced," was to enable the agriculturist, before "sowing the seed," to make provision to carry on his business. The purpose of the statute is proclaimed in its title to "encourage agriculture," then greatly depressed, by enabling those engaged in it to get the means and appliances to prosecute that industry. They should not be required to wait until the seed was sown before making the necessary financial arrangements of the year. The means must be secured beforehand, so that the agriculturist may know how many laborers he can employ, how much food, how many animals to provide, etc. To give effect to that intent which is conveyed by the language, the mortage or deed of trust takes preference from its date, as to subsequent incumbrances, but subject to this qualification, that if given after the passage of the act of the 5th April, 1872, it is inferior to the liens created by the 1st and 10th sections.

When Payne & Raines took the mortgage from Arlow Mince, it was subject to his right to employ laborers, and subject to the "first lien," which this act of 1872 created in their behalf.

This mortgage operated on Arlow Mince's crop, subject to the lien in favor of Thomas.

But there was testimony which tended to show that Thomas waived his prior right in favor of the mortgagee. In that aspect of the case, without expressing any opinion on the weight of that testimony, it becomes necessary to consider the claims of Buck as a purchaser, for value, without notice of the mortgage, and whether his rights, in that character, were fairly presented to the jury under the instructions of the court.

2d. Is Buck a *bona fide* purchaser without notice of the mortgage to Paine & Raines?

The testimony on the point is to the effect, that when Didlake, the clerk of Buck, was negotiating to levy the cotton, the witness, James, "told him that there was some claim of some sort upon it, that [he had better look out. Didlake then went off and consulted a lawyer, returned and said he would take the risk."

The rule is, that whatever will put a party upon inquiry, which, if pursued with ordinary diligence and understanding, would lead to knowledge of the requisite fact, is notice of it. McLeod v. First Nat. Bank, 42 Miss., 112. A subsequent purchaser or creditor, about to deal with the property, if they have notice of a prior claim or equity, or of facts, which, if followed up, will discover the truth, are put under a duty to make the investigation; and if they fail to do so, are chargeable with knowledge which the inquiry would have disclosed. Parker v. Foy & Florer, 43 Miss., 260.

It is laid down as a rule by 2 Sugden on Vendues, 528, " that the puchaser is not bound to attend to vague rumors, to statements by mere strangers; the notice must proceed from some person interested in the property." In Wailes v. Cooper, 24 Miss., 228, the notice of the unregistered mortgage was given by Hale, the vendor. "The notice thus communicated is (say the court) all the notice required by the statute." "It was not a mere floating rumor, circulated by irresponsible persons, which, perhaps, the party might have disregarded."

The mortgage takes effect as to creditors and purchasers, from the date it is filed for record, and is void as to subsequent creditors and purchasers without notice, unless recorded. The *fact* which must be brought home to the subsequent purchaser, is notice that the unrecorded mortgage exists. When, therefore, the cases refer to knowledge of "circumstances" which shall put a party on inquiry, the circumstances themselves must come from a responsible source, and be of a character which, if followed up, will lead to the requisite information. Such is the effect of the open, visible possession by the vendee. As possession presumptively follows the right, a purchaser or creditor is thereby warned to inquire "by what right the occupant holds." The information which Buck's clerk had was, "that there was some claim of some sort upon upon the cotton." The witness had no interest in the cotton, and from the vague and indefinite language used, did not

know the nature of the claim, whether by judgment, mortgage or joint ownership, etc., nor to whom the claim belonged. He disclosed no circumstance which pointed to the mortgage, nor did he indicate any person who asserted any sort of claim. If Didlake had examined the judgment roll or the registry books, he would have found neither judgment nor mortgage. Was he under an obligation to search further? If so, to whom should he go? It is not necessary to the exigencies of this case, to go as far as to hold that notice of an unregistered deed may not be given to a purchaser or creditor by a stranger who has no interest in the property, as laid down by Mr. Sugden. That doctrine in the breadth stated by him has been questioned, and we make no committal on the subject. Dart on, V. & P., 402, 403, chap. XV.

This vague information to Buck's agent was not of the character to put him on inquiry, and did not amount to notice.

We have already said that the mortgage of Arlow Mince was subordinate and subject to a right in him to employ labor, and that for the wages, the law raised a "first lien," which would be superior to the mortgage. There was in this case testimony tending to show that Thomas Mince engaged to work with his father, with knowledge of the extent and scope of the mortgage, and with a recognition on his part of its terms; and an acquiescence of the rights conferred by the mortgagee, and a waiver of his own. The instruction granted for the mortgagees, Paine & Raines, was in effect, that the mortgage was superior to the lien of the laborer. That view of the law is not in accordance with the views hereinbefore expressed. It is also erroneous in not distinctly presenting to the jury (in view of the testimony of waiver by Thomas Mince), the further proposition that if Buck was a *bona fide* purchaser, without notice, that is ample protection of his right to the cotton.

If, therefore, the jury should be satisfied from testimony, that Thomas Mince waived his right, in favor of the mortgagee, nevertheless he was the owner of the cotton subject to the mortgage, and a sale of it to Buck, an innocent purchaser, would pass to him a good title.

For these errors the judgment is reversed, and the cause is remanded for a new trial.