## Bank of Mississippi vs. Steven Duncan et al.[1]

1. Chancery Practice: *Appointment of a receiver. Power over them.*

It is common practice in chancery to appoint, in proper cases, a receiver. Nothing is thus adjudged other than that it is deemed improper for either party to hold the fund or property. The appointment is provisional. The receiver is regarded as an officer of the court, and the fund as in *custodia legis*. Where the court takes the fund from a defendant, pending litigation, and afterwards becomes satisfied it cannot grant relief, and dismisses the bill, it still has power to retain the bill for the purpose of repairing the wrong. Equity courts can compel receivers to pay a fund into court, or to account, etc.

2. Jurisdiction of the Various Courts: *Constitution of 1832. Act of 1858.* Scire facias.

In considering the distribution of powers among the courts of original jurisdiction, the convention of 1832 had reference to an existing body of jurisprudence, which had its original in the mother country, but had been greatly modified in adapting it to the circumstances of a new country, as well as by legislation. It retained, however, its essential features, both in respect of its principles and modes of procedure. Those subjects which pertained to superior common law courts were confided to the circuit court; those which belonged to equity, to a chancery court. To the circuit court the grant is "original jurisdiction in all matters civil and criminal;" to the chancery court, "full jurisdiction in all matters of equity," etc. In construing a constitution or statute, meaning must be given to every word, for each was used to aid in giving complete expression to legislative will. The word "full"—"full jurisdiction"—implies that nothing is reserved; whatever is a matter of equity, as to that the power to adjudge is full. This court was established to administer that system of equity jurisprudence which then existed—unwritten and positive—and such enlarged dimensions as it might attain to by an ample development of its principles, and a more enlarged application of them to the new circumstances of an advancing civilization. However this system may expand, the "full jurisdiction" conferred gives the court capacity to fully administer it.

3. Same: *Power of legislature to confer jurisdiction on chancery court.*

The legislature cannot abstract from one, cognizance conferred by the constitution, and give it to another. It cannot take from the chancery court a subject purely and exclusively equitable, and transfer it to the circuit court. But there is on the confines of this court a shadowy margin, about which courts cannot pronounce with confidence, and which legitimately belongs to the domain of legislation. "Full jurisdiction" indicates that where the court takes hold of a subject it ought to dispose of it fully and finally. That

---

[1] Note.—This case was presented on three different occasion, at each of which counsel filed able and elaborate briefs. Reporters regret their inability to condense the various briefs into such a space as would warrant their publication, without detracting too much from their merit.

suggests an appropriate field for legislation within constitutional limits. If the subject of litigation be a matter of equity, the legislature can give to the chancery court cognizance over all incidental and dependent matters, so as to give to the respective litigants the full benefit of their rights, and enable the court to pronounce finally. The legislature has power to authorize the chancery court to entertain jurisdiction over the bond of a receiver appointed by the court, and the sureties thereon, in a prescribed formula, holding the sureties to the same measure of liability as would a court of law in the same circumstances. Such jurisdiction is in aid of its authority over the principal matter. That was what was done by the act of 1858. It gave a new remedy on the bond. It empowered the chancery court to administer, in behalf of any person who had been damaged by its breach, redress by the assessment of damages. The formula was the *scire facias*. This is the equivalent of, and substitute for, the suit at law. The legislation which was condemned by the decision of Smith *v.* Everett, 50 Miss., 575, and cases predicated upon it, is valid and constitutional.

APPEAL from the Chancery Court of *Washington* County.
Hon. E. STAFFORD, Chancellor.
The facts sufficiently appear in the opinion of the court.
*Harris & George*, for appellant.
*T. J. & F. A. R. Wharton*, and *J. Winchester*, for appellees.

SIMRALL C. J., delivered the opinion of the court.

In 1843 Brown Brothers & Co. brought a suit in chancery against the Bank of Mississippi, and its directors personally, alleging that they were creditors of the bank to the amount of about $150,000, and that the officers of the bank and its directors were wasting and misapplying its assets.

Pending the litigation Charles A. Lacoste was appointed receiver, with instructions to take possession of its property, bills receivable, and assets generally. His bond, in the penalty of $300,000, with Duncan and Marshall sureties, was payable to Robert H. Buckner, chancellor, and his successors.

An amended and supplemental bill alleged the recovery of a judgment at law since the filing of the original bill.

In 1855, on demurrer of the defendants, the original and supplemental bills were dismissed for want of jurisdiction in a court of equity to grant the relief. The cause, however, was

retained for the purpose of settlement with the receiver. On appeal the decree was, in 1856, affirmed. The substance of that part of the decree was "to close his accounts as receiver * * * and compel the return of the assets * * or their proceeds into court."

On the return of the cause to the chancery court Lacoste was ordered, on the 16th of December, 1856, to make his report by the 20th of the next March, with instructions to bring or pay into court all moneys by him collected, and all notes, bonds, bills of exchange, and also all renewals taken in substitution, payment, or compromise.

After some delays, in 1857, the receiver made his report. In October of that year the exceptions to it were sustained, except as to his compensation, which were overruled, and he was discharged from contempt.

On the 23d of November, 1857, the papers in the cause, the report and the exceptions thereto, were referred to W. L. C. Nugent, as commissioner, it being recited that Lacoste had removed from the state. On the 25th of the same month Nugent reported, charging Lacoste with $125,000 of money, and $223,411, the amount of bonds, notes, and bills receivable which came to his hands. This report was on the same day confirmed. Thereupon it was ordered that a *scire facias* issue predicated on the bond, according to the statute in that case provided, commanding the parties to appear on the 14th of May, 1860, to show cause why the court should not proceed to assess the damages, claimed to amount to $300,000. The writ was sued out against the sureties alone.

Marshall and Duncan demurred, and assigned for causes :

1. That the pretended act of the legislature under which the *scire facias* was sued out was unconstitutional and void.

2. The court has no jurisdiction.

3. The Bank of Mississippi is not in existence.

From the decision sustaining the demurrer and dismissing the writ the bank prosecutes this appeal.

It is common practice of the chancery court, in proper cases,

to appoint a receiver to take charge of property or a fund the subject of litigation.

No more is adjudged thereby than that it does not seem reasonable that either party should hold it. The appointment is provisional. The receiver holds as the officer of the court, and the property or funds are esteemed in *custodia legis*, awaiting its decision as to the final disposition.

It would seem hardly to require the aid of argument or authority to prove that if the court takes the fund out of the possession of the defendant, although it may afterwards be satisfied that it has no jurisdiction to grant the relief sought by the complainant, and for that reason dismiss his bill, it has power to retain the cause for the purpose of repairing the wrong and making restitution.

That has become *res adjudicata* by the affirmance of the chancellor's decree.

The question which has been chiefly discussed by counsel is whether it was competent for the legislature, under the constitution of 1832, to have passed the statute of 1858, giving the remedy by *scire facias* on the receiver's bond. That presents the general question whether the legislature was restrained by the constitution from conferring upon the chancery court power to give full redress against the receiver and his sureties. It has not been controverted that the court, by virtue of its ordinary equity powers, could compel the receiver to account and pay the fund into court, or as it might direct, and enforce obedience to its orders by attachment or other proceedings, as for contempt of its authority.

But it is urged that, according to the distribution of the judicial power in the constitution, the remedy upon the bond was purely legal, and was conferred on the circuit court. The constitution, in express words, vests the judicial power in the several courts therein provided for.

Capacity is conferred upon the one or the other of the courts to hear and determine every suit that may arise. The judicial

power has been exhausted; and every right can be vindicated, and every wrong, public and private, be punished or redressed in one or another of the courts specifically named.

When the legislature, under the 24th section of the 4th article, established inferior courts, it did and could do no more than intrust to such tribunals cognizance over certain subjects inferior to that exercised by a court specifically established by the constitution. As instances were the criminal courts, the vice chancery courts, and the county courts.

There is no room for cavil as to the jurisdiction of the high court of errors and appeals. The language of the 4th section is in both the affirmative and negative form, conveying the idea that all other power is excluded except such as is embraced in the affirmative words, "shall have no jurisdiction but such as properly belongs to a court of errors and appeals." Original pleas and plaints are excluded. Whilst the intent was to give exclusively the appellate jurisdiction, it was intended that it should be full and complete. Hence it has uniformly exercised all incidental power necessary to the complete and adequate exaction of its exclusive appellate power, such as giving judgment on appeal and writ of error, bonds, recognizances, and the like.

In considering the distribution of power among the courts of original jurisdiction, it must be borne in mind that the convention had reference to an existing body of jurisprudence which had its origin in the mother country, but had been greatly modified in adapting it to the circumstances of a new country, as well as by legislation. It had, however, retained its essential features, both in respect of its principles and modes of procedure. There was that grand body of unwritten law—including the common law, strictly so-called, and equity law—which had been administered in separate courts, conducting business by different formulæ and modes of trial.

Constrained by the judicial history and traditions of the past, the convention of 1832 must of necessity organize courts to

administer this jurisprudence according to the departments into which it was divided and upon the models which experience had approved.

Accepting the British system as the suggestive original, with the modifications which the older states had made, and which were planted here in territorial times and in the constitution of 1817, the convention of 1832 necessarily assigned those subjects which pertained to superior common law courts to the circuit courts, and those which belonged to equity to a chancery court. The terms of the grant to the circuit court are " original jurisdiction in all matters civil and criminal;" to the chancery court, " full jurisdiction in all matters of equity," subject to a limited concurrent jurisdiction in the circuit court.

We are instructed to give a meaning to every word in a constitution or statute, for each (we must suppose) was used to aid in giving complete expression to the will of the lawmaker. The word "*full*"—" full jurisdiction"—implies that nothing is reserved. Whatever is a matter of equity, as to that the power to adjudge is full.

This court was established to preside over and administer that system of equity jurisprudence which then existed—unwritten and positive—and such enlarged dimensions as it might attain to by an ample development of its principles, and a more enlarged application of them to the new circumstances of an advancing society and civilization. Equity jurisprudence is especially the product of English tried reason and conscience, perhaps their highest and most beneficent achievement.

From small germs it has been of rapid growth, especially in the last century. However the system may expand, the " full jurisdiction" conferred gives the court capacity to " fully " administer it.

This growth has been nourished from two sources : 1st, by its own natural development ; 2d, by legislation.

Being a court of equity jurisdiction, the argument has been advanced that the legislature cannot confer jurisdiction which

is not in its nature of that sort, nor upon the circuit courts any other than purely common law subjects.

The 1st section of the 4th article distinctly presents the idea that the several courts have limits. It would seem to follow that the legislature cannot abstract from one, cognizance conferred by the constitution, and give it to another.

It cannot, for instance, take from the chancery courts a subject purely and exclusively equitable, and transfer it to the circuit court. Whilst that is so, there is on the confines of these courts a shadowy margin, like that which divides twilight from darkness, about which courts cannot pronounce with confidence, and which legitimately belongs to the domain of legislation.

It ought to have been observed that a part of the jurisdiction of the chancery court is limited by the 18th section of the 4th article, and is conferred on the probate court, such as relates to idiots, lunatics, and persons *non compos mentis*.

But the word "*full*"—"*full* jurisdiction"—is not satisfied when restricted to the subjects of it.

It indicates that where the court takes hold of a subject it ought to dispose of it fully and finally. That suggests an appropriate field for legislation, within constitutional limits.

If the subject of litigation be "a matter of equity," why should not the legislature give to the court cognizance over all incidental and dependent matters, so as to give to the respective litigants the full benefit of their rights, and enable the court to pronounce finally?

If a fund, upon which a creditor for any reason has an equity, is in danger of being removed, or is being misapplied, a case arises for the appointment of a receiver. It would, within the principle, be a just and proper exercise of legislative power to authorize the chancery court to entertain jurisdiction over the bond and the sureties, in a prescribed formula, holding the sureties to the same measure of liability as would a court of law in the same circumstances. Such jurisdiction

is in aid of its authority over the principal matter. That was: what was done by the act of 1858. It gave a new remedy on the bond; it empowered the chancery court to administer, in behalf of any person who had been damaged by reason of its breach, redress by the assessment of damages. The formula was the *scire facias*. This is the equivalent of, and a substitute for, the suit at law.

Such ancillary legislation, resting on the same principle, has been frequently adopted; for instance, art. 50, Code, 1857, p. 549, which gives to a bond, with sureties, for property bought at judicial sale, after maturity, the force and effect of a judgment, collectible by execution, as at law. Such is the act which allows the circuit court to entertain a bill of discovery in aid of a pending suit. The courts of law have from time to time adopted equitable principles, and given them validity through the equitable action of assumpsit, and in that mode acquired a large and still increasing concurrent jurisdiction.

It is quite manifest that the constitution did not intend to interfere with this concurrent jurisdiction, but to leave the chancery court and the circuit court in possession of it. The chancery court took, under the constitution, in addition to what might be called pure and exclusive equity cognizance, also its concurrent jurisdiction; and so of the circuit courts.

In Farish *v.* The State, 4 How., 174, the court, speaking of the language of the constitution in the 16th section, 4th article, say : "It was intended to embrace such subjects of jurisdiction as the chancery court had possessed by immemorial usage or particular *legislative enactments*." The scope of the reasoning is that when the legislature creates a new subject of jurisdiction it at once becomes one of those matters of equity referred to in the constitution.

The court *arguendo* say : "It is not so much the subject, as the particular mode of procedure, which determines the jurisdiction." The right to sue the state as an ordinary creditor, in the chancery court, was sustained because that jurisdiction

did not pertain to a court of law, and the statute therefore did not subtract anything from the law court.

The doctrine laid down in Servis v. Beatty, 32 Miss., 81, is that the concurrent jurisdiction of the circuit and chancery courts remained unaffected, and that in determining the extent of that of the chancery court we must consider the recognized equity standards, and the acts of the legislature declaratory of its powers and jurisdiction.

The cases establish these propositions : 1st, that the court of chancery has jurisdiction over all those subjects which are, from immemorial usage, peculiarly and exclusively "matters of equity ;" 2d, over those which are concurrent with the circuit courts ; and, 3d, over new subjects which may be conferred upon it, and which before did not belong to a court of law. To which may be added enlarging and enabling statutes, to enable it to adjudicate fully and finally.

In addition to the statutes already referred to, falling within the range of this classification, may be mentioned the act creating the mechanic's lien, and the jurisdiction in respect of it conferred on the circuit courts. Warwick v. Richardson, 7 How., 131. The statute in reference to removal of clouds from title, much of it conferring a new jurisdiction on the chancery court. Huntington v. Allen, 44 Miss., 654. And the statutes enabling the circuit courts to enforce the contracts of married women out of their separate estate.

Within the range of these principles falls the act of 1858, in question. We are entirely satisfied of its validity.

There was always great embarrassment and difficulty in defining the precise boundaries of jurisdiction between the chancery and probate courts. It was because much of the latter was exclusive. The constitution of 1869 relieves the courts of that subject of vexation, by vesting in the chancery court all the jurisdiction conferred by the constitution of 1832 on both the chancery and probate courts.

We are all of opinion that the legislation which was condemned by the decisions of Smith v. Everett, 50 Miss., 575,

and the cases predicated upon it, is valid and constitutional, and that those decisions ought not to be followed. A majority of the judges who participated in those decisions became satisfied they were unsound, and so expressed themselves in Bell v. West Point, 51 Miss., 262.

The purpose of the act of 1858 was to give to the chancery court a remedy on the bond co-extensive and concurrent with the action at law.

The same facts could be recited in the *scire facias*—as breaches, and causing damages—as could be set forth in the declaration. In either suit the inquiry would be precisely the same, and the recovery the same. The undertaking of the sureties was for "whom it might concern," and any person, whether party to the suit or not, could assign breaches by *scire facias*. So, also, the sureties could plead any defense which would be appropriate in a suit at law, such as *non est factum*, a release of all actions, etc.

The act for the first time created this remedy in the chancery court; it did not exist before. We do not think that the chancery court in this state had, as part of its remedial agency, the writ of *scire facias* in cases like this. The chancellor here never had any of the common law jurisdiction which belonged to his office in England, and which is more ancient, and in very early times perhaps more important, than the extraordinary jurisdiction which he exercises as an equity judge.

In the exercise of the former he sat as a common law judge, in a particular department of the court known as the Petty Bay office, and held pleas upon *scire facias*, to repeal or cancel letters patent, of petitions *monstrans de droit*; also pleas of all personal actions, concerning the duty or service of any officer or minister of the court.

But if any cause in this court comes to an issue of fact, the chancellor can not try it, but must deliver the record *propria manu* in the King's Bench, where it shall be tried by the country, and judgment thereon shall be given; and when

judgment is given on demurrer or the like, a writ of error, in nature of an appeal, lay to the King's Bench. 2 Bl. Com., book 3, p. 48. In note 17 to the text, *supra*, it is said : "The chancellor, sitting on the common law side of his court, exercises a special jurisdiction as a common law judge."

"But on the other side of his court, when exercising his extraordinary equity jurisdiction, he can decide disputed questions of both law and fact."

Maddox, 1st vol., ch. 4, gives this account of this peculiar jurisdiction : It extends "to *scire facias*, to repeal letters patent, *monstrans de droit*, traverses of office, *scire faciases upon recognizances*, * * * etc."

It is to the *scire facias* issued out of the Petty Bay office, under this peculiar common law jurisdiction, that the case of Grant *v.* Stone, 1 Vern., 313, may have reference. None of this special jurisdiction, distinguishable from the extraordinary jurisdiction of the chancellor, ever formed any part of the chancery system in this state.

It never had any adaptation or fitness here, and did not pass, by the constitution, that meant to assign the extraordinary, or equity, recognizance to the chancery court.

In United States *v.* Stone, 7 Wall., 535, an ordinary bill was brought to cancel the letters patent, as the appropriate proceeding in this country for annulling them, if issued by fraud or mistake. There the land office department had sold land, for which the patent issued, which had been reserved from sale.

We conclude that the statute of 1858 introduced a new remedy on the bond of a receiver, which did not before that exist in this state. But for the statute, any party aggrieved who was protected by the bond must have sued at law.

A *scire facias* may be as completely a new and original suit as debt or covenant. Its ordinary use in our jurisprudence is in continuation of a pending suit, or in nature of satisfaction of a judgment. It is always in nature of an action, since the defendant may plead anything appropriate as reason why the

relief should not be granted.   Sometimes it is in continuation of a pending suit, as where it is sought to continue its prosecution against an administrator, or heir, of the original defendant. It is also said to be in continuation of the former suit, and in nature of process, where it is sought to have satisfaction of a recovery against an intestate out of the effects in the hands of his administrator, or of his heir, where lands have descended.

But if the object, as under the English practice, be to repeal letters patent, or for a judgment on a recognizance against the cognizor, it is an original suit.   Foster on Sci. Fa., 13; Pollard v. Eckford, 50 Miss., 656, and authorities there cited. It is an original suit, because the defendants are called in question for the first time on their obligation, and may plead any and all matters appropriate to an original suit.

The character of the judgment is another test.

If it be against some person who stands in privity with the original debtor, as the executor or heir, then the judgment is that the creditor may have execution of the property in their hands; but if the object be a personal judgment against the defendants, as in the case we are now considering, then the suit is an original action.   It is original because it is founded on an obligation which it is averred has been broken, and, by reason of it, entailed damages on the bank, and because the recovery would be these damages.

It would hardly be doubted that, if the bank had sued Duncan and Marshal, in 1860, on the bond at law, it would have been an original suit, although the declaration had recited every fact and breach set forth in the scire facias.

The substance is not changed, nor is the result different, when by another mode of proceeding they are pursued on the same obligation in the chancery court.   If there had been a foreclosure suit pending, at the suit of the bank in February, 1850, on a mortgage to secure a note with personal sureties, it could, under the act of 1840, have continued to prosecute to judgment and satisfaction until now.   But could it in 1860 have

brought a personal action at law against the sureties on the note. Would not that have been a new suit?.

There was no privity between Duncan and Marshal and Lacoste as to any of the proceedings taken in the chancery court against the receiver. They are not bound by anything found in any report or order. They undertook to indemnify any person injured by the failure of Lacoste to discharge his duty. Suppose the fact to be that Lacoste paid over the $125,000, reported by the commissioner to have been collected by him, to the note holders or depositors, or to Brown Brothers. & Co., in liquidation of their debt against the bank, could it be said that the bank had been damaged by that transaction, and could not these appellees have pleaded it to the *scire facias*, or to an action at law? Suppose, further, that he had assigned $100,000 of the notes in extinguishment of that much of the bank's debt, and that all the rest and residue of the credits were insolvent, might not that be set up as showing that the bank had sustained but little, if any, injury?

The second cause of demurrer is that the Bank of Mississippi had ceased to exist.

It was pressed in argument by the appellees that the dissolution of the corporation was effected by the act of 21st February, 1840. Acts, 63, 64. The act retained to the bank all its corporate franchises, except its banking privileges, for the space of ten years, to enable it to collect its debts, by renewal or otherwise, and to discharge its liabilities.. The 5th section declares that after the expiration of ten years from the date of the act all rights, powers, and privileges, of every kind and character, shall cease and end, except so far as to enable said corporation to prosecute or defend suits then pending and undetermined.

The difficulty with which we are encountered is that counsel on both sides discussed at the bar questions involved on the predicate that this act was obligatory on the bank and governed this case.

But, on more mature consideration, we are satisfied that the record does not show that the act is obligatory on the bank, nor have the counsel for appellant formally conceded or admitted that it does.

We are obliged, therefore, to put that statute out of view. Without it there is nothing to show that the corporation has ceased to exist.

If the fact be so, by acceptance of the act, or for any other reason, the appellees must show it by affirmative defense to the *scire facias*.

We are brought, therefore, to the conclusion that the demurrer to the *scire facias* ought to have been overruled.

Judgment reversed, and judgment in this court overruling the demurrer to the *scire facias*, and cause remanded, with leave to defendants to plead, or make further defense, as advised, in sixty days from date.